**FEDERAL ELECTION COMMISSION,**
Plaintiff-Appellee,

v.

**T. Bertram LANCE,**
Defendant-Appellant.

No. 78–1859.

United States Court of Appeals,
Fifth Circuit.

May 5, 1980.

Trotter, Bondurant, Griffin, Miller & Hishon, Emmet J. Bondurant, Atlanta, Ga., Robert A. Altman, Washington, D. C., for defendant-appellant.

William C. Oldaker, Gen. Counsel, Federal Election Commission, Charles N. Steele, Lester N. Scall, Kathleen Imig Perkins, Carolyn U. Oliphant, Washington, D. C., for plaintiff-appellee.

Before COLEMAN, Chief Judge, and BROWN and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

This case concerns the validity of an administrative subpoena, issued by the Federal Election Commission (FEC or Commission), requiring T. Bertram Lance to appear for a deposition and to produce certain documents. The subpoena is incident to an enforcement investigation of possible illegal contributions by two national banks to the Bert Lance for Governor Campaign of 1974. The Commission began the investigation after determining, pursuant to 2 U.S.C. § 437g(a)(2) (1976), that there was "reason to believe" the banks and the Bert Lance Campaign Committee had violated the Federal Corrupt Practices Act, 2 U.S.C. § 441b

(1976) (FCPA).[1] Upon Lance's failure to appear for the deposition, the Commission petitioned the district court for the Northern District of Georgia to enforce the subpoena. After a hearing, the district court ordered Lance to comply with the subpoena. Lance now appeals from that order.

Although we hold that the district court correctly rejected the arguments that Lance raised in the enforcement proceedings, we decline to order enforcement of the subpoena because we conclude that there exists a serious question whether the Federal Corrupt Practices Act is constitutional. If the FCPA is unconstitutional, then the subpoena, issued in aid of an investigation intended to enforce the Act, must be invalid as well. This panel does not have jurisdiction to resolve the constitutional issue, however. Section 437h of the Federal Election Campaign Act of 1971, as amended (FECA), 2 U.S.C. §§ 431–455 (1976), requires that the question be presented to the en banc court.

The enforcement order is stayed pending the en banc decision.

## I

Lance ran for Governor of Georgia in 1974. The campaign ended on August 12, 1974, when Lance lost in the Democratic primary election. In September and November 1977, the Federal Election Commission, acting on the basis of information it had acquired in the ordinary course of carrying out its supervisory responsibilities over the Federal Election Campaign Act, found reason to believe that the 1974 Bert Lance for Governor Campaign Committee, the Calhoun First National Bank (Calhoun Bank), and the National City Bank of Rome, Georgia (National City Bank), had violated section 441b. The possible violations relate to extensions of credit by the two banks to the campaign committee before, during, and after Lance's campaign.

---

1. The sections of 441b pertinent to this case provide:

(a) It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a *contribution or expenditure* in connection with any election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, or for any corporation whatever, or any labor organization, to make a contribution or expenditure in connection with any election at which presidential and vice presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to, Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, or for any candidate, political committee, or other person knowingly to accept or receive any contribution prohibited by this section, or any officer or any director of any corporation or any national bank or any officer of any labor organization to consent to any contribution or expenditure by the corporation, national bank, or labor organization, as the case may be, prohibited by this section.

(b) . . .

(2) For purposes of this section and section 79l(h) of Title 15, the term 'contribution or expenditure' shall include any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value (except a loan of money by a national or State bank made in accordance with the applicable banking laws and regulations and in the ordinary course of business) to any candidate, campaign committee, or political party or organization, in connection with any election to any of the offices referred to in this section, but shall not include (A) communications by a corporation to its stockholders and executive or administrative personnel and their families or by a labor organization to its members and their families on any subject; (B) nonpartisan registration and get-out-the-vote campaigns by a corporation aimed at its stockholders and executive or administrative personnel and their families, or by a labor organization aimed at its members and their families; and (C) the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes by a corporation, labor organization, membership organization, cooperative, or corporation without capital stock.

(Emphasis added.)

From 1925 until 1976, the proscriptions now set out in section 441b were codified as section 610 of the Federal Corrupt Practices Act of 1925, 18 U.S.C. § 610 (1970) (repealed 1976). Although it is now a part of the Federal Election Campaign Act, 2 U.S.C. §§ 431–455 (1976), section 441(b) continues to be known as the Federal Corrupt Practices Act. *See First National Bank of Boston v. Bellotti*, 435 U.S. 765 n.26, 98 S.Ct. 1407, 1422, 55 L.Ed.2d 707 (1978).

The Commission contends that the suspect extensions of credit include "overdrafts in 1974, repaid in 1975, loans made during the 1974 campaign, other extensions of credit made during 1974 and repaid in 1975, and loans made between 1975 and 1977 for the purpose of repaying outstanding campaign debts." Brief for the Commission, at 3.

On November 10, 1977, the Commission subpoenaed Lance, requiring him to produce documents and to appear for a deposition on December 2, 1977. Lance moved the Commission on November 22, 1977, to quash the subpoena, and the Commission denied the motion to quash on November 29, 1977. When Lance failed to appear for the scheduled deposition, the Commission petitioned the district court to enforce the subpoena.

The district court held a hearing on January 16, 1978, and considered briefs and affidavits filed by the parties. Lance raised the following arguments in the district court: (1) since section 441b is a criminal statute, the FEC's attempt to apply the statute to justify an investigation of events that occurred prior to its enactment violates the ex post facto and due process clauses of the Constitution; (2) the statute of limitations bars the investigation; (3) the FEC has no jurisdiction to investigate violations of section 610 (the predecessor of section 441b, see note 1 supra) that occurred prior to 1975; and (4) since the FEC already has all the information that it might acquire by the subpoena, enforcement should be denied on grounds of burden and harassment. On February 9, 1978, the district court granted enforcement of the subpoena, reasoning that the subpoena was well within the Commission's "broad and inclusive" statutory authority to investigate violations of the FECA. Record at 82. Lance moved the court to reconsider its order, and that motion was denied on March 24, 1978.

In this appeal, Lance raises again the four arguments that he expounded in the proceedings below. In addition, he contends that the subpoena must be quashed since section 441b violates the first amendment.

## II

The FEC derives its power to issue subpoenas from 2 U.S.C. § 437d:

(a) The Commission has the power—

. . . . .

(3) to require by subpena, signed by the chairman or the vice chairman, the attendance and testimony of witnesses and the production of all documentary evidence relating to the execution of its duties . . . .

One of the Commission's duties is to investigate alleged violations of the FECA when "[t]he Commission . . . has reason to believe that such a violation has occurred . . . ." 2 U.S.C. § 437g(a)(2). The Commission's subpoena of Lance is grounded upon its finding that there exists "reason to believe" that § 441b has been violated. The Commission may not enforce its own subpoena, but must petition for enforcement in the district court. 2 U.S.C. § 437d(b).

■ The Supreme Court has clearly indicated that a court's role in a proceeding to enforce an administrative subpoena is a limited one. In *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943), the Court considered the validity of a subpoena issued by the Secretary of Labor incident to a proceeding under the Walsh-Healey Public Contracts Act. The Court held that the subpoena should be enforced since the evidence sought "was not plainly incompetent or irrelevant to any lawful purpose of the Secretary . . . ." *Id.* at 509, 63 S.Ct. at 343.

The Supreme Court again considered the legal principles governing the enforcement of an administrative subpoena in *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946). There, the Court considered a challenge to subpoenas issued by the Administrator of the Wage and Hour Division, Department of Labor, as part of an investigation under the Fair Labor Standards Act. The Court ordered enforcement, holding that "[i]t is enough that the investigation be for a law-

fully authorized purpose, within the power of Congress to command." *Id.* at 209, 66 S.Ct. at 505. In addition, the court pointed out that the requirement that the Administrator not act arbitrarily or outside of his statutory authority "does not mean that his inquiry must be 'limited . . . by . . forecasts of the probable result of the investigation . . .'" *Id.* at 216, 66 S.Ct. at 509, quoting *Blair v. United States*, 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919).

*United States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S.Ct. 357, 369, 94 L.Ed. 401 (1950), a case involving the investigatory power of the Federal Trade Commission, provided the Court with the opportunity to elaborate on the standard that it had applied in *Oklahoma Press*: "it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." The Court emphasized that administrative investigations could not be equated with the more constrained operations of the judicial process:

> Because judicial power is reluctant if not unable to summon evidence until it is shown to be relevant to issues in litigation, it does not follow that an administrative agency charged with seeing that the laws are enforced may not have and exercise powers of original inquiry. It has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not. When investigative and accusatory duties are delegated by statute to an administrative body, it, too, may take steps to inform itself as to whether there is probable violation of the law.

*Id.* at 642–43, 70 S.Ct. at 364. *See also, United States v. Bisceglia*, 420 U.S. 141, 147, 95 S.Ct. 915, 919, 43 L.Ed.2d 88 (1975).

The significance of the distinction between administrative investigations and judicial fact-finding has also been recognized by this court:

> [T]here are grave policy considerations that militate against allowing the process of administrative investigation to become adversary in nature, even after it becomes specific and particularized. These considerations were succinctly stated by the Supreme Court in *Hannah v. Larche*, 363 U.S. 420, 443–44, 80 S.Ct. 1502, [1515, 4 L.Ed.2d 1307], where it stated:
>
> > . . . [T]he investigative process could be completely disrupted if investigative hearings were transformed into trial-like proceedings . . . . Fact-finding agencies . . . would be plagued by the injection of collateral issues that would make the investigation interminable. * * * This type of proceeding would make a shambles of the investigation and stifle the agency in its gathering of facts.

*Genuine Parts Co. v. Federal Trade Commission*, 445 F.2d 1382, 1388 (5th Cir. 1971). In *Genuine Parts* the Genuine Parts Company challenged an order, issued by the Federal Trade Commission, requiring the company to file certain information. The court held that the company had to submit the requested information since the administrative order was not oppressive or unreasonably burdensome, and, since it was for an authorized purpose, was sufficiently definite, and was reasonably relevant to the purpose of the investigation. *Id.* at 1391.

The legal standards and policy considerations set out in these cases provide the framework for our analysis of Lance's objections to the Federal Election Commission's subpoena.

### A.

■ Lance's first objection is based on the ex post facto and due process clauses of the Constitution. He points out that the Commission's petition for enforcement expressly states that the subpoena was issued incident to an investigation of suspected violations of section 441b by the 1974 Bert

Lance for Governor Campaign Committee, the Calhoun Bank, and the National City Bank. Section 441b was not enacted until May 1976, however. It is clear, Lance argues, that the suspected violations could not have occurred after the date of the enactment and that the ex post facto and due process clauses bar a prosecution founded on any earlier transactions. Since the investigation could not result in the issuance of a complaint, the subpoena does not meet the *Oklahoma Press* requirement of a *lawfully* authorized purpose. Brief of T. Bertram Lance at 25.

There are several reasons why we cannot agree with Lance. A statute does not run afoul of the ex post facto clause unless it " 'makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action,' or . . . '*aggravates* a *crime*, or makes it *greater* than it was when committed.' " *Bouie v. City of Columbia,* 378 U.S. 347, 353, 84 S.Ct. 1697, 1702, 12 L.Ed.2d 894 (1964), quoting *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798). The first problem with Lance's argument is that the proscription the campaign committee and the banks are suspected of violating has been in effect since 1907, when Congress passed the Tillman Act. 34 Stat. 864. The Tillman Act's prohibition of political contributions by national banks was re-enacted as the Federal Corrupt Practices Act in 1925, 43 Stat. 1070 (later codified at 18 U.S.C. § 610 (1970) (repealed 1976)), and was recodified as section 441b in 1976. The 1976 amendment that effected the recodification provides that, except as otherwise stated, any "section or penalty [of section 610] shall be treated as remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of any penalty, forfeiture or liability." Pub.L. No. 94–283, 90 Stat. 475, 495 (appearing at note to 2 U.S.C. § 441 (1976)). Since section

441b contains the same proscription as section 610, it follows that any action falling within the terms of section 441b could not have been "innocent when done" if the act was committed while section 610 was in force. The 1976 amendment indicates that Congress intended the recodification of section 610 to absolve no one from being charged with violating that provision.

The second weakness in Lance's argument is that it rests on the notion that 2 U.S.C. § 437g, which sets out remedies for violations of the FECA, is a *criminal* statute that *aggravates* a crime or increases the penalties. Section 437g authorizes a broad range of remedies for violations ·of 441b. For example, the Commission may seek an informal conciliation agreement, or it may bring an action for an injunction or a fine not greater than five thousand dollars or an amount equal to the contribution or expenditure involved in the violation.[2] The statute explicitly states that the cause of action and the possible penalties are "civil." Lance argues that the remedies available to the Commission must, nevertheless, be regarded as "criminal in nature." He further contends that section 437g has impermissibly "increased the penalties" for a section 441b violation since some of the sanctions might impose a greater monetary loss on a violator than the criminal penalties of the predecessor statute, section 610.[3]

In *Federal Election Commission v. Weinsten,* 462 F.Supp. 243 (S.D.N.Y.1978), the court rejected the argument that the penalties set out in section 437g are really "quasi-criminal," holding that "Congress' language is dispositive and the penalties imposed by FEC are . . . civil in nature." *Id.* at 252. Lance has not presented any reasoning or cited any authority that persuades us to disagree with the *Weinsten* court.

Even if we could accept the idea that some of the section 437g remedies are crimi-

---

**2.** If the violation was willful, the violator is subject to a civil penalty not greater than $10,-000 or 200% of the unlawful contribution.

**3.** Violations of 18 U.S.C. § 610 by individuals were punishable by a fine of not more than

$1,000 or imprisonment of not more than one year, or both; if the violation was willful, the maximum fine was $10,000 and the maximum imprisonment was five years.

nal in nature, Lance's argument would fail because we cannot assume that the Commission would, in a future proceeding against any of the subjects of the investigation, request the maximum penalty permitted by the statute. If the Commission were to seek no greater penalty than a fine in an amount permitted by section 610, the Commission's action could not conceivably violate the ex post facto or due process clauses. *See, Smith v. Johnson*, 458 F.Supp. 289, 292 (E.D.La.1977) ("[I]t is not a violation of the *ex post facto* provision for the individual to be sentenced to a penalty less harsh than the one that it appeared he would be subjected to, and was given notice of, at the moment of the crime.").

A further reason for our rejection of Lance's argument is that it assumes, as we may not, that any future FEC proceeding against the subjects of the investigation would *necessarily* depend solely on transactions that occurred before the enactment of section 441b. Lance argues that the record is clear that no unlawful contributions, in the form of overdrafts or other payments, could have been made later than January 15, 1975. The "record" to which Lance refers consists of briefs, affidavits, and other documents that Lance has submitted to the court. As the FEC correctly observes, he seeks to substitute his own unsworn assertion that no violations could have occurred later than January 1975 for a judgment based on evidence assimilated through an FEC investigation. Neither the district court nor this court is "free to speculate about the possible charges that might be included in a future complaint, and then to determine the [validity] of the subpoena requests by reference to those hypothetical charges." *FTC v. Texaco*, 555 F.2d 862, 874 (D.C.Cir.) (en banc), *cert. denied sub nom. Standard Oil Co. of California v. FTC*, 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977). *See also Oklahoma Press Publishing Co. v. Walling*, 327 U.S. at 276, 66 S.Ct. at 509.

### B.

■ Lance next contends that the Commission's subpoena should not be enforced since any action that the Commission might bring in the future to remedy an alleged violation of section 441b would be barred by the statute of limitations. He cites no authority in direct support of the proposition that the FEC may not investigate a suspected violation after the period of limitations has run. Rather, he suggests that the running of the statute would prevent the issuance of a "complaint" and relies on *Harriman v. Interstate Commerce Commission*, 211 U.S. 407, 29 S.Ct. 115, 53 L.Ed. 253 (1908), for his assertion that the FEC has no power to issue a subpoena that "cannot possibly concern 'matters that might [be] the object of [a] complaint.'" Brief of T. Bertram Lance at 35, quoting *Harriman* at 419, 29 S.Ct. at 118. Although we admit the continuing validity of the *Harriman* Court's statement, we think that Lance has too facilely assumed that the existence of a statute of limitations defense means that no complaint may issue. To the contrary, there is case law to the effect that "an indictment states an offense even though the crime alleged appears to be barred by limitation." *United States v. Doyle*, 348 F.2d 715, 718 (2d Cir.), *cert. denied*, 382 U.S. 843, 86 S.Ct. 89, 15 L.Ed.2d 84 (1965). We need not decide whether the running of the statute—or, if no statute of limitations is applicable, the mere passing of time—would *ever* deprive an administrative agency of its power to conduct an investigation because it is manifest that such a principle could not proscribe the FEC's investigation in this case.

■ The period of limitations on which Lance bases his argument is set out in 2 U.S.C. § 455(a):

No person shall be prosecuted, tried or punished for any violation of subchapter I of this chapter [including section 441b] unless the indictment is found or the information is instituted within 3 years after the date of the violation.

The statute refers to the institution of an "information" or an "indictment," but not to the pursuit of a civil remedy. Thus, the statutory language indicates that the period

of limitations applies only to the criminal prosecutions for violations of the FECA authorized by 2 U.S.C. § 441j. The legislative history of section 455 supports this literal reading of the statute. The Senate Conference Report, S.Rep.No.93–1237, 93d Cong., 2d Sess. (1974), *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 5587, 5618, 5668–69, explains that the section 455 period of limitations applies to the bringing of a "*criminal* action" (emphasis added). As we noted above, section 437g explicitly states that the actions that the FEC may bring are *civil.* Congress did not provide for a statute of limitations that would be applicable to civil enforcement actions brought by the FEC, and there is no general federal period of limitations for civil actions. Since state statutes of limitation are not applicable to suits by a federal agency to enforce rights of the sovereign, *see, e. g., Equal Employment Opportunity Commission v. Griffin Wheel Co.*, 511 F.2d 456 (5th Cir. 1975), there appears to be no time limit to the FEC's power to seek a section 437g remedy.

■ Even if the section 455 period of limitations were applicable, we would not be persuaded by Lance's argument. The argument demands that we assume that the Commission's investigation could not possibly uncover evidence that a violation has occurred within the period of limitations. As we stated above, however, a court may not hypothesize the fruits of an investigation in a proceeding to enforce an administrative subpoena. *See* pp. 370–371 *supra.*[4]

### C.

■ Lance's third objection to the subpoena is that the Commission has no jurisdiction to conduct civil investigations concerning violations of the Federal Corrupt Practices Act occurring prior to 1975. Congress created the Federal Election Commission and gave the Commission its enforcement powers with the Federal Election Campaign Act Amendments of 1974, Pub.L. No.93–443, 88 Stat. 1263 (Amendments) (amending the Federal Election Campaign Act of 1971, 86 Stat. 3). Section 410 of the Amendments set January 1, 1975, as the date on which the Amendments were to become effective. Lance does not dispute that the Amendments gave the Commission enforcement authority over section 610, the predecessor of section 441b; rather, he contends that the Commission's remedial powers are prospective only, such that the Commission has no jurisdiction to investigate violations of section 610 occurring before the effective date of the Amendments.

Lance relies on *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), as authority for his contention that the FEC has only prospective jurisdiction over section 610. In that case, the Supreme Court rejected the notion that a private cause of action is proper to remedy violations of section 610, holding that the Amendments gave the Commission primary and exclusive authority over such violations. *Id.* at 74–77, 95 S.Ct. 2086–87. The Amendments, the Court noted, "established an administrative procedure for processing complaints of alleged violations of § 610 after January 1, 1975 . . . ." *Id.* at 74–75, 95 S.Ct. at 2086. Lance's argument depends on the ambiguity of the reference of the phrase "after January 1, 1975." Lance's argument assumes that the phrase was intended to modify "violations." The Commission answers that the Court was saying merely that the "procedure for processing complaints" was to be effective "after January 1, 1975." We think that the Commission's interpretation of the Court's language is the only reasonable one. There is no doubt

---

4. Lance suggests that his argument does not depend on speculation about the evidence the Commission might obtain through its investigation. Rather, he asks us to hold, as a matter of law, that section 441b does not prohibit contributions made *after* an election. Since the election involved in the Commission's investigation took place in 1974, we would not have to engage in any speculation to conclude that no violation could have occurred after that date. We decline to accept Lance's reading of the statute, for it would permit candidates to evade the FECA's restrictions on contributions and expenditures by running their campaigns at a deficit and then collecting contributions after the election.

that section 410 of the 1974 Amendments states that January 1, 1975, is the effective date of the Amendments—including the provisions creating the Commission and giving it civil enforcement authority. In the context of the entire opinion, it is clear that the Court's intent was simply to convey this uncontroversial fact as part of some general background information about the Amendments. There was no reason to consider whether the Commission's remedial powers were only prospectively applicable, and if the Court *had* chosen to address this issue, it surely would not have done so in such an off-hand manner.

█ In opposition to the *Cort v. Ash* language on which Lance relies, there is powerful evidence that Congress specifically intended the Commission's enforcement powers to be retroactively applicable. When Congress recodified in 1976 the substantive prohibitions of section 610 as section 441b, it enacted at the same time a savings clause providing that the repeal of section 610 and the penalties for its violation "shall not have the effect of releasing or extinguishing any penalty, forfeiture, or liability incurred under such section or penalty, and such section or penalty shall be treated as remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of any penalty, forfeiture, or liability." P.L. 94–283, 90 Stat. 475, 495 (appearing at note to 2 U.S.C. § 441 (1976)). Section 610 was, on its face, a criminal statute; however, the savings clause "sustains" not only criminal prosecutions for violations of section 610, but also "any proper action." The phrase "any proper action" apparently refers to the civil remedies that the Commission might pursue under section 437g. Thus, the savings clause evidences Congress's intent that the Commission have the authority to apply its own enforcement powers "retroactively" to remedy violations of section 610. As we observed in our discussion of Lance's ex post facto-due process argument, there is no constitutional bar to applying newly enacted civil penalties—or lesser criminal penalties—to a pre-existing criminal prohibition. *See* p. 370 *supra.*

We need not conclusively resolve at this time the question whether the FEC's remedial powers are retroactively applicable, however. Even if it were settled that the Commission had no authority to investigate violations of section 610 that occurred before January 1, 1975, again it would be improper for us to speculate that the investigation could not uncover evidence that any violation occurred after that date. *See* pp. 370–371 *supra.*

### D.

█ The fourth argument Lance raises against enforcement of the subpoena is that the subpoena is "unnecessarily burdensome and harassing" because "the information sought from Mr. Lance is already in the FEC's possession." Brief of T. Bertram Lance at 43. The Commission obtained all the relevant information about the 1974 gubernatorial campaign, Lance contends, "as a result of two prior investigations of the Comptroller of the Currency investigating appellant's testimony before the Senate Committee on Governmental Affairs." *Id.* We agree with Lance that "burden and harassment" may sometimes be a ground for a court to deny enforcement of an administrative subpoena, *see* p. 369 *supra,* and we suppose that it might be unduly burdensome for an agency to require someone to produce the very evidence that the agency has previously acquired. In this case, however, we cannot assume, on the basis of Lance's assertions, that the documents requested by the subpoena are identical to those that the Commission has obtained from other sources; nor can we accept Lance's contention that the Commission already has the answers to deposition questions that it has not yet asked.

### E.

█ Lance's final argument in opposition to the subpoena draws on the principle that courts will refuse to enforce a subpoena unless the investigation to which the subpoena is incident is "for a lawfully authorized purpose, within the power of Congress to

command." *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. at 209, 66 S.Ct. at 505. Lance contends, in effect, that section 441b (FCPA) is unconstitutional, and that it is not within the power of Congress to authorize the enforcement of an unconstitutional statute.

In arguing that the FCPA is unconstitutional, Lance relies most heavily on *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) and *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), which was decided after Lance filed his appeal from the district court's enforcement order. In *Buckley v. Valeo*, the Supreme Court held unconstitutional the FECA's $1,000 per candidate ceiling on political "expenditures" in federal elections. Two years later, in *First National Bank of Boston*, the Court held unconstitutional as violative of the first amendment a Massachusetts statute prohibiting "business corporation[s] incorporated under the laws of or doing business in the Commonwealth" from making contributions or expenditures "for the purpose of . . . influencing or affecting the vote on any question submitted to the voters . . ." 435 U.S. at 768 n.2, 98 S.Ct. at 1412. Dissenting in *First National Bank of Boston*, Justice White warned that the combined effect of *Buckley v. Valeo* and *First National Bank of Boston* was simply "to reserve the formal interment of the Corrupt Practices Act . . . for another day." 435 U.S. at 821, 98 S.Ct. at 1439. Lance urges that Justice White was correct and that the day has arrived.

Since Lance did not raise the first amendment issue in the district court proceedings, our first inquiry is whether the issue may be raised on appeal. The general rule is that, "in the absence of a miscarriage of justice, issues not raised or presented in the lower court will not be considered for the first time on appeal." *Excavators and Erectors, Inc. v. Bullard Engineers, Inc.*, 489 F.2d 318, 320 (5th Cir. 1973). In *Higginbotham v. Ford Motor Co.*, 540 F.2d 762, 768 n.10 (5th Cir. 1976), we explained, "the rationale for the rule requires its application if additional facts would have been devel-oped in the trial court had the new theory been presented there; in that case judicial economy is served and prejudice is avoided by binding the parties to the facts presented and the theories argued below." Here, however, as in *Higginbotham*, the "new theory raises a purely legal question. No facts could have been developed to aid our resolution of the issue." *Id.* Also as in *Higginbotham*, the parties have filed post-oral argument briefs discussing the issue at the request of the court. *See id.* In the circumstances of the case, we agree with the *Higginbotham* court that "it would be unjust . . . to refuse to consider the new argument." *Id.* *See also Milhouse v. Levi*, 548 F.2d 357, 363 (D.C.Cir. 1976); *United States v. Jones*, 527 F.2d 817, 819 (D.C.Cir. 1975).

Nevertheless, there is an additional bar to this panel's considering Lance's first amendment argument. Section 437h(a) of the FECA provides: "The district court immediately shall certify all questions of constitutionality of this Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc." Congress's obvious intent in enacting this section was to deprive district courts and panels of the circuit courts of appeals of jurisdiction to consider the constitutionality of the FECA. In our view, the outcome of the present appeal depends on the resolution of the question of the constitutionality of section 441b, which is, of course, part of the FECA. Therefore, we must submit this case to the en banc court for resolution of the first amendment issue.

SUBMITTED TO EN BANC COURT.

COLEMAN, Chief Judge, concurring specially.

I agree that the case should be submitted to the en banc court on the issue of constitutionality. That being so, I would hold that the case in its entirety should go there for the reason that subsidiary issues should not be decided pending a determination of constitutionality.