**FEDERAL ELECTION COMMISSION,**
Plaintiff–Appellee,

v.

**T. Bertram LANCE,**
Defendant–Appellant.

No. 78–1859.

United States Court of Appeals,
Fifth Circuit.

Jan. 15, 1981.

---

Trotter, Bondurant, Griffin, Miller & Hishon, Emmet J. Bondurant, Atlanta, Ga., Robert A. Altman, Washington, D. C., for defendant–appellant.

Charles N. Steele, Kathleen Imig Perkins, Carolyn U. Oliphant, Gen. Counsel, Federal Election Commission, Washington, D. C., for plaintiff–appellee.

James A. McPherson, New Orleans, La., Kenneth J. Guido, Jr., Ellen G. Block, Washington, D. C., for amicus curiae Common Cause.

Before COLEMAN, Chief Judge, BROWN, AINSWORTH, GODBOLD, CHARLES CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN, VANCE, KRAVITCH, FRANK M. JOHNSON, Jr., GARZA, HENDERSON, REAVLEY, POLITZ, HATCHETT, ANDERSON, RANDALL, TATE, SAM D. JOHNSON and THOMAS A. CLARK, Circuit Judges.*

TJOFLAT, Circuit Judge:

The Federal Election Commission (FEC or Commission) brought this action to en-

* Judge Jerre S. Williams did not participate in the oral argument or the conference on this case and, therefore, does not participate in this decision.

force an administrative subpoena requiring T. Bertram Lance to appear for a deposition and to produce certain documents. The subpoena is incident to an enforcement investigation of possibly illegal loans, some in the form of overdrafts, made by two national banks to the Bert Lance for Governor Campaign of 1974. The Commission began the investigation after determining, pursuant to 2 U.S.C. § 437g(a)(2) (1976), that there was "reason to believe" the banks and the Bert Lance Campaign Committee had violated the Federal Corrupt Practices Act, 2 U.S.C. § 441b (1976) (FCPA or Act).[1] Upon Lance's failure to appear for the deposition, the Commission petitioned the district court to enforce the subpoena. After a hearing, the district court ordered Lance to comply with the subpoena, and Lance appealed from that order.

A panel of this court held that the district court correctly had rejected the arguments that Lance had raised in the enforcement proceedings, but declined to order enforcement of the subpoena because it concluded that "there exists a serious question whether the Federal Corrupt Practices Act is constitutional." *Federal Election Commission v. Lance*, 617 F.2d 365, 367 (5th Cir. 1980). "If the FCPA is unconstitutional," the panel reasoned, "then the subpoena, issued in aid of an investigation intended to enforce the Act, must be invalid as well." *Id.* at 367. Nevertheless, the panel declined to resolve the constitutional issue, ruling that section 437h of the Federal Election Campaign Act of 1971, as amended (FECA), 2 U.S.C. §§ 431–455 (1976), requires that the question be decided by the en banc court. *Id.* at 374.

We conclude that the provisions of the Act that Lance has standing to challenge are not facially unconstitutional and that none of Lance's other objections to the subpoena have merit. Therefore, we affirm

---

1. The sections of 441b pertinent to this case provide:

(a) It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a *contribution or expenditure* in connection with any election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, or for any corporation whatever, or any labor organization, to make a contribution or expenditure in connection with any election at which presidential and vice presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to, Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, or for any candidate, political committee, or other person knowingly to accept or receive any contribution prohibited by this section, or any officer or any director of any corporation or any national bank or any officer of any labor organization to consent to any contribution or expenditure by the corporation, national bank, or labor organization, as the case may be, prohibited by this section.

(b) . . .

(2) For purposes of this section and section 79*l*(h) of title 15, the term *"contribution or expenditure" shall include any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value (except a loan of money by a national or State bank made in accordance* with the applicable banking laws and regulations and in the ordinary course of business) to any candidate, campaign committee, or political party or organization, in connection with any election to any of the offices referred to in this section, but shall not include (A) communications by a corporation to its stockholders and executive or administrative personnel and their families or by a labor organization to its members and their families on any subject; (B) non partisan registration and get-out-the-vote campaigns by a corporation aimed at its stockholders and executive or administrative personnel and their families, or by a labor organization aimed at its members and their families; and (C) the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes by a corporation, labor organization, membership organization, cooperative, or corporation without capital stock.

(Emphasis added.)

From 1925 until 1976, the proscriptions now set out in section 441b were codified as section 610 of the Federal Corrupt Practices Act of 1925, 18 U.S.C. § 610 (1970) (repealed 1976). Although now a part of the Federal Election Campaign Act, 2 U.S.C. §§ 431–455 (1976), section 441b continues to be known as the Federal Corrupt Practices Act. *See First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 788, n.26, 98 S.Ct. 1407, 1422, n.26, 55 L.Ed.2d 707 (1978).

the district court's order enforcing the subpoena.

## I

Lance ran for Governor of Georgia in 1974. The Bert Lance for Governor Campaign Committee had checking accounts with two banks, the Calhoun First National Bank (Calhoun Bank) and the National City Bank of Rome, Georgia (National City Bank). The campaign ended on August 12, 1974, when Lance lost in the Democratic primary election. In April, 1975, the Enforcement and Compliance Section of the Comptroller of the Currency of the United States began an investigation of the financial dealings between the campaign committee and the Calhoun Bank. In a report dated September 22, 1975, the Comptroller set out its findings that the Calhoun Bank had repeatedly permitted the campaign committee to overdraw its accounts to pay campaign expenses. The overdrafts were still being repaid, the report stated, as late as January 31, 1975, and the bank "was paid no interest for the use of its money . . . ." Record at 37. The report concluded that these transactions indicated possible violations of the Federal Corrupt Practices Act as well as of 18 U.S.C. § 656 (1976) (a statute concerning misapplication of bank funds) and 18 U.S.C. § 1005 (1976) (a statute prohibiting false bank record entries).

The Comptroller again scrutinized the financing of the 1974 Bert Lance for Governor Campaign in 1977 as a part of a comprehensive investigation of Lance's financial affairs. This second investigation concluded with a report, dated August 18, 1977, that further detailed the irregular extensions of credit by the Calhoun Bank to the campaign committee before, during, and after Lance's campaign.[2]

In September and November, 1977, the Federal Election Commission, acting on the basis of the reports issued by the Comptroller of the Currency, record at 4, found reason to believe that the Bert Lance for Governor Campaign Committee, the Calhoun Bank, and the National City Bank had violated section 441b. The Commission asserts that the suspected violations relate to the two banks' extensions of credit to the Campaign Committee, including "overdrafts in 1974, repaid in 1975, loans made during the 1974 campaign, other extensions of credit made during 1974, and repaid in 1975, and loans made between 1975 and 1977 for the purpose of repaying outstanding campaign debts." Brief for the Commission, at 3.

After making the requisite finding of "reason to believe" that the Act had been violated, see § 437g(a)(2), the Commission began an enforcement investigation. On November 10, 1977, the Commission subpoenaed Lance, requiring him to produce documents and to appear for a deposition on December 2, 1977. Lance moved the Commission on November 22, 1977, to quash the subpoena; the Commission denied the motion on November 29, 1977. When Lance failed to appear for the scheduled deposition, the Commission petitioned the district court to enforce the subpoena.

The district court held a hearing on January 16, 1978, at which it considered briefs and affidavits filed by the parties. Lance raised the following arguments in the district court: (1) since section 441b is a criminal statute, the FEC's attempt to apply the statute to justify an investigation of events that occurred prior to its enactment violates the ex post facto and due process clauses of the Constitution; (2) the statute of limitations bars the investigation; (3) the FEC has no jurisdiction to investigate violations of section 610 (the predecessor of section 441b, see note 1 supra) that occurred prior to 1975; and (4) since the FEC already has all the information that it might acquire by the subpoena, enforcement should be denied on grounds of burden and harassment. On February 9, 1978, the district court granted

---

2. As Lance admits, Brief for T. Bertram Lance at 7, the campaign committee also overdrew its accounts with the National City Bank of Rome. The record does not, however, reveal whether the transactions with the National City Bank were also investigated by the Comptroller of the Currency.

enforcement of the subpoena, reasoning that the subpoena was well within the Commission's "broad and inclusive" statutory authority to investigate violations of the FECA. Record at 82. Lance moved the court to reconsider its order, and that motion was denied on March 24, 1978.

On appeal, Lance raised again the four arguments that he had advanced in the district court. In addition, he argued that the subpoena should be quashed on the ground that section 441b was facially violative of the first amendment. After rejecting Lance's first four arguments, the panel determined that he could challenge the facial constitutionality of the Act on appeal even though he had not raised the issue in the district court proceedings:

> The general rule is that, "in the absence of a miscarriage of justice, issues not raised or presented in the lower court will not be considered for the first time on appeal." *Excavators and Erectors, Inc. v. Bullard Engineers, Inc.*, 489 F.2d 318, 320 (5th Cir. 1973). In *Higginbotham v. Ford Motor Co.*, 540 F.2d 762, 768 n.10 (5th Cir. 1976), we explained, "the rationale for the rule requires its application if additional facts would have been developed in the trial court had the new theory been presented there; in that case judicial economy is served and prejudice is avoided by binding the parties to the facts presented and the theories argued below." Here, however, as in *Higginbotham*, the "new theory raises a purely legal question. No facts could have been developed to aid our resolution of the issue." *Id.* Also as in *Higginbotham*, the parties have filed post–oral argument briefs discussing the issue at the request of the court. *See id.* In the circumstances of the case, we agree with the *Higginbotham* court that "it would be unjust . . . to refuse to consider the new argument." *Id. See also Milhouse v. Levi*, 548 F.2d 357, 363 (D.C.Cir.1976); *United States v. Jones*, 527 F.2d 817, 819 (D.C. Cir.1975).

*Federal Election Commission v. Lance*, 617 F.2d 365, 374 (5th Cir. 1980).

The panel went on to hold, however, that it lacked jurisdiction to resolve the constitutional question:

> Nevertheless, there is an additional bar to this panel's considering Lance's first amendment argument. Section 437h(a) of the FECA provides: "The district court immediately shall certify all questions of constitutionality of this Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc." Congress's obvious intent in enacting this section was to deprive district courts and panels of the circuit courts of appeals of jurisdiction to consider the constitutionality of the FECA. In our view, the outcome of the present appeal depends on the resolution of the question of the constitutionality of section 441b, which is, of course, part of the FECA. Therefore, we must submit this case to the en banc court for resolution of the first amendment issue.

*Id.* at 374.

## II

█ Section 437h(a), the statutory provision under which the panel presented this case to the en banc court, is an extraordinary piece of legislation. Subsection (a) provides:

> The Commission, the national committee of any political party, or any individual eligible to vote in any election for the office of President of the United States may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act. The district court immediately shall certify all questions of constitutionality of this Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc.

As the Ninth Circuit, sitting en banc, recently observed, "[v]arious difficult questions can be raised about the meaning and constitutionality," *California Medical Association v. Federal Election Commission*

No. 79–4426 (9th Cir. May 23, 1980) (en banc), of the section's requirement that "all questions of constitutionality of this Act" be heard by "the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc." 2 U.S.C. § 437h(a) (1976). One of these questions, as the Ninth Circuit put it, is "the extent to which the breadth of the statutory phrase 'all questions of constitutionality' may trench upon a court's independence in the manner and scope of its decisionmaking." *Id.* See *Federal Election Commission v. Central Long Island Tax Reform Immediately Committee*, 616 F.2d 45, 51 (2d Cir. 1980). There is also some question whether Congress intended to restrict the en banc review provision to actions *instituted* to challenge the constitutionality of the FECA and instituted by the three types of plaintiffs listed in the first sentence of section 437h(a). See *Bread Political Action Committee v. Federal Election Commission*, 591 F.2d 29, 33 (7th Cir. 1979) (holding that the en banc review provision applies only to actions "brought expressly to challenge the [FECA] on constitutional grounds," but that the provision may be invoked by plaintiffs other than those of the three named types).[3]

The sparse legislative history of section 437h provides little guidance for the resolution of these issues.[4] The Ninth Circuit interpreted the legislative history as follows:

[Section 437h] originated as an amendment offered by Senator Buckley to expedite authoritative Supreme Court determination of the Act's constitutionality. The en banc requirement apparently was deemed to be an expediting mechanism due to a misconception that an en banc hearing was a matter of right following a hearing by a panel of three appellate judges; to require an initial en banc hearing was thus thought to eliminate a merely "preliminary" three–judge hearing. . . . That proposition is, of course, inaccurate: en banc hearings are discretionary. See Fed.R.App.P. 35(a). It has been suggested that the effect of an en banc requirement may be to impede rather than expedite. We are not prepared to say that has occurred in the instant case, but if mandatory en banc hearings were multiplied, the effect on the calendars of this court as to such matters and as to all other business might be severe and disruptive.

*California Medical Association*, at ——— (citations omitted).

We agree with the Ninth Circuit that "delicate questions" such as those raised by section 437h "are to be decided only when necessary." *Id.* Therefore, as the Ninth Circuit has done, we shall let our decision to hear the case en banc rest on our discretionary power under Fed.R.App.P. 35. *Id.*[5]

---

**3.** We note that not even the Federal Election Commission has a firm and principled position on this issue. The Commission argued in the present case that the panel had no authority to rule on Lance's first amendment challenge to the Act on the ground that "2 U.S.C. § 437h requires that 'questions of the constitutionality' of the Federal Election Campaign Act must be heard by the court of appeals, *en banc*, with direct appeal of the decision of the *en banc* court to the Supreme Court." Supplemental Brief for Federal Election Commission at 12, n.6. After the panel had agreed with the Commission and had sent the case to this court, the Commission switched positions and argued: "The extraordinary judicial review mechanism of 2 U.S.C. § 437h which requires that certain cases be heard by the courts of appeals sitting *en banc* was improperly invoked in the context of this subpoena enforcement action. The legislative history of section 437h as well as the prior cases brought under the provision demon-

strate that the panel erroneously concluded that this court is required by 2 U.S.C. § 437h to determine the constitutionality of section 441b sitting *en banc*." Supplemental Brief to the Court of Appeals *En Banc* for Federal Election Commission at 14.

**4.** The legislative history of section 437h is succinctly set out in the district court's opinion in *Buckley v. Valeo*, 387 F.Supp. 135, 139–41 (D.D.C.1975), *certified to en banc court*, 519 F.2d 821 (D.C.Cir.1975) (per curiam) (en banc), *aff'd in part and rev'd in part*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

**5.** Our authority to take this case en banc pursuant to Fed.R.App.P. 35 is even more certain than was the Ninth Circuit's in *California Medical Association*. In *California Medical Association*, the district court certified the case directly to the en banc court without ruling on the

### III

Since we have decided to treat this case under Rule 35, there is no doubt, as there might be if we were to rely on section 437h, that we may consider *all* the issues in this case and not just Lance's challenge to the facial constitutionality of the FCPA.

We adopt in full those portions of the panel opinion rejecting Lance's arguments that the subpoena should be quashed because (1) the statute of limitation bars the investigation; (2) the FEC has no jurisdiction to investigate violations of the FCPA that occurred prior to 1975; and (3) the subpoena is unduly burdensome and harassing. We conclude, however, that the panel should not have reached the merits of Lance's ex post facto clause claim because the claim is not ripe for adjudication.

The Supreme Court stated the general rule for determining ripeness in *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937):

> The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. . . . It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

*See International Tape Manufacturers Association v. Gerstein*, 494 F.2d 25, 27 (5th Cir. 1974). An important factor in considering ripeness is whether the tendered issue involves "uncertain and contingent future events that may not occur as anticipated, or indeed may not occur at all." 13 Wright, Miller & Cooper, Federal Practice and Procedure § 3532 (1975).

■ In arguing that the Commission's investigation violates the ex post facto clause, Lance notes that the Commission's petition for enforcement of the subpoena expressly states that the subpoena was issued incident to an investigation under section 441b. Section 441b was enacted in May, 1976; the suspected violations occurred in 1974 and 1975. It is clear, Lance argues, that the ex post facto clause bars a prosecution founded on transactions that occurred prior to the date of the statute's enactment. Since the investigation could not result in the issuance of a complaint, the subpoena does not meet the requirement of *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 209, 66 S.Ct. 494, 505, 90 L.Ed. 614 (1946), that it be a part of an investigation "for a lawfully authorized purpose, within the power of Congress to command." Brief of T. Bertram Lance at 25.

We are unable to agree with this argument. A statute does not run afoul of the ex post facto clause unless it "'makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action,' or . . . '*aggravates* a *crime*, or makes it *greater* than it was, when committed.'" *Bouie v. City of Columbia*, 378 U.S. 347, 353, 84 S.Ct. 1697, 1702, 12 L.Ed.2d 894 (1964) (*quoting Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798)). Lance's argument demands that we first assume that any future FEC proceeding against the subjects of the investigation would *necessarily* depend solely on transactions that occurred before the enactment of section 441b. Lance contends that the record is clear that no unlawful contributions, in the form of overdrafts or other payments, could have been made later than the enactment of the statute. The "record" to which Lance refers consists of briefs, affidavits, and other documents that Lance has submitted to the court. As the FEC correctly observes, he seeks to substitute his own unsworn assertion that no violations could have occurred later than January, 1975, for a judgment based on evidence assimilated through an FEC investigation. We are not, however, "free to speculate about the possible charges that might be

---

merits. Arguably, the district court's order certifying the case was not an appealable "final order." In the present case, however, the district court clearly entered a final order–the order enforcing the subpoena–so there is no doubt that the ordinary rules governing appeals may be invoked.

included in a future complaint, and then to determine the [validity] of the subpoena requests by reference to those hypothetical charges." *FTC v. Texaco, Inc.*, 555 F.2d 862, 874 (D.C.Cir.) (en banc), *cert. denied, sub nom. Standard Oil Co. of California v. FTC*, 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977). *See also: Oklahoma Press Publishing Co. v. Walling*, 327 U.S. at 216, 66 S.Ct. at 509. Since Lance's ex post facto argument would require us to deliver an opinion "advising what the law would be upon a hypothetical state of facts," *Aetna Life Insurance Co. v. Haworth*, 300 U.S. at 241, 57 S.Ct. at 464, we dismiss the claim as unripe.

There is one other reason why the claim is unripe. Lance's claim depends on a finding that 2 U.S.C. § 437g, which sets out remedies that the FEC may seek for violations of 441b, is a *criminal* statute. Section 437g authorizes a broad range of remedies for violations of 441b. For example, the Commission may seek an informal conciliation agreement, or it may bring an action for an injunction or a fine not greater than five thousand dollars or an amount equal to the contribution or expenditure involved in the violation. The statute explicitly states that the cause of action and the possible penalties are "civil." Section 437g(a)(5)(D) expressly provides for a referral of criminal proceedings to the Department of Justice. Lance argues that the remedies available to the Commission must, nevertheless, be regarded as "criminal in nature." It is conceivable, we think, that some of the remedies available to the Commission are "criminal in nature," but it is obvious that others are "civil." To analyze Lance's ex post facto claim, we would have to *assume* that the present investigation will culminate in proceedings to impose penal–type sanctions against Lance. Because it is uncertain whether these events will occur precisely as Lance anticipates, the claim is not mature.

## IV

■ Lance's only remaining argument against enforcement of the subpoena is that

section 441b is facially unconstitutional and that Congress is therefore unable to authorize its enforcement.[6] He relies most heavily on *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), which was decided after Lance filed his appeal from the district court's enforcement order, and *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). The panel summarized Lance's argument as follows:

> In *Buckley v. Valeo*, the Supreme Court held unconstitutional the FECA's $1,000 per candidate ceiling on political "expenditures" in federal elections. Two years later, in *First National Bank of Boston*, the Court held unconstitutional as violative of the first amendment a Massachusetts statute prohibiting "business corporation[s] incorporated under the laws of or doing business in the Commonwealth" from making contributions or expenditures "for the purpose of . . . influencing or affecting the vote on any question submitted to the voters . . . ." 435 U.S. at 768 n.2, 98 S.Ct. at 1412 [55 L.Ed.2d 707]. Dissenting in *First National Bank of Boston*, Justice White warned that the combined effect of *Buckley v. Valeo* and *First National Bank of Boston* was simply "to reserve the formal interment of the Corrupt Practices Act . . . for another day." 435 U.S. at 821, 98 S.Ct. at 1439 [55 L.Ed.2d 707]. Lance urges that Justice White was correct and that the day has arrived.

*Federal Election Commission v. Lance*, at 374.

■ Lance's first amendment attack is directed against section 441b as a whole. The first question we must resolve, then, is whether Lance has standing to challenge the entire statute. We conclude that he does not.

Section 441b is not written as a single, broad injunction. Rather, it is a series of discrete, separable prohibitions. One distinct prohibition, of course, is the provision

---

**6.** We agree with the panel that Lance should be permitted to challenge the constitutionality of the Act even though he failed to do so in the district court proceedings. *See* pp. 1136–1137, *supra*.

making it unlawful for a national bank to make "a contribution or expenditure in connection with any election . . . ." 2 U.S.C. § 441b(a) (1976).

Congress clearly intended the prohibitions of the statute to be severable. Section 454 of the FECA is a severability clause enacted to avoid the invalidation of the entire statute if the courts strike down any portion as unconstitutional:

> If any provision of this Act, or the application thereof to any person or circumstance, is held invalid, the validity of the remainder of the Act and the application of such provision to other persons and circumstances shall not be affected thereby.

The FEC investigation that generated the subpoena is founded on the Comptroller of the Currency's reports that the Lance campaign committee had been given bank loans, or overdrafts, out of the ordinary course of banking business. *Supra* at 1135. It is on the basis of these reports that the Commission rested its finding of "reason to believe" that the Act had been violated. *Id.* at 1136. The only portion of the Act that the Comptroller's reports suggest may have been violated is the portion prohibiting banks from making loans to political candidates except in the ordinary course of business. Neither Lance nor the Commission suggests that any reason exists to suspect that the subjects of the investigation may have violated any other part of the Act. Thus, the only part of the Act with which the investigation is concerned at this time is the prohibition against bank loans made out of the ordinary course of business.

We have no doubt that Lance has standing to challenge that particular prohibition, but we find that he does not have "such a personal stake" in the constitutionality of any other portion of the Act "as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

Lance argues that this general standing requirement of "injury in fact" does not preclude his attacking section 441b as a whole because of the exception for first amendment challenges to overbroad statutes. *See Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). We do not believe that the overbreadth doctrine is applicable in the present case. The Supreme Court has described the doctrine as follows:

> [T]he Court has altered its traditional rules of standing to permit—in the First Amendment area—"attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity." *Dombrowski v. Pfister*, 380 U.S. at 486, 85 S.Ct. at 1121 [14 L.Ed.2d 22]. Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.

*Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973).

The Supreme Court emphasized in *Broadrick* that the doctrine must be employed sparingly:

> The consequence of our departure from traditional rules of standing in the First Amendment area is that any enforcement of a statute thus placed at issue is totally forbidden until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression. Application of the overbreadth doctrine in this manner is, manifestly, strong medicine. It has been employed by the Court sparingly and only as a last resort. Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute.

*Id.* at 613, 93 S.Ct. at 916.

Our initial problem in finding that Lance may invoke the overbreadth doctrine to at-

tack prohibitions under section 441b that are concededly inapplicable to his conduct, is that each section 441b prohibition is discrete and separable from the others. *Supra* at 1139. We have reviewed the many overbreadth cases to which Lance's brief refers us; in each of these cases, the court was concerned with overbroad prohibitions not amenable to narrowing. Here, however, Lance argues not that the prohibition applicable to him is overbroad and incapable of being narrowed, but that other prohibitions, tied to the one to which he is subject only by their inclusion in a common statutory scheme, are unconstitutional. Even if Lance is correct that these other prohibitions may be unconstitutional, we do not see how this helps Lance, since our invalidation of them would still leave the particular prohibition applicable to Lance standing and enforceable.

Further, the rationale of the overbreadth doctrine is simply not apposite in the context of a challenge to section 441b. The rationale is that the mere existence of overbroad legislation regulating speech will "chill" expression by causing some persons not before the court to refrain from exercising their first amendment rights. *See Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). It is reasonable to suppose that even if section 441b were overbroad it would not have a "chilling effect" substantial enough to justify invoking the overbreadth exception to the standing rule, since no one need risk criminal or civil penalties to test the statute's constitutionality. Section 437h specifically provides that any voter, as well as the Commission or any national political party, may bring a declaratory judgment action to challenge the statute.

Finally, Lance should not be allowed to use the overbreadth doctrine in this subpoena enforcement proceeding. We have, in the past, held that "the scope of issues which may be litigated in an [subpoena] enforcement proceeding must be narrow, because of the important governmental interest in the expeditious investigation of possible unlawful activity." *FTC v. Texaco*, 555 F.2d 862, 873 (5th Cir. 1977). We think that allowing an overbreadth attack against the entire statute here would be at odds with our understanding of the appropriate role of the courts in determining whether a subpoena should be enforced.

In light of these considerations, we hold that Lance has standing to challenge section 441b only as it prohibits banks from making loans, or permitting overdrafts, in connection with an election and out of the ordinary course of business. As to that specific challenge to section 441b, we find Lance's claim unpersuasive.

V

■ The Supreme Court's opinion in *Buckley v. Valeo* indicates that there exist important differences, for purposes of first amendment analysis of statutes regulating campaign speech, between "contributions" and "expenditures." An expenditure, according to the *Buckley* approach, is a payment to a third party for the purpose of influencing the outcome of an election. Examples of such independent expenditures include the costs of distributing handbills or leaflets, the financing of speeches or rallies, and the financing of television or radio publicity. 424 U.S. at 19, 96 S.Ct. at 635. A contribution, on the other hand, is a direct payment to a candidate or campaign committee. Unlike the contributions the Court considered in *Buckley*, however, the overdrafts made to the Lance campaign committee out of the ordinary course of business had no speech elements at all. Because the overdrafts, according to the Comptroller's reports, were made out of the ordinary course of business, they were inherently private or secret, and were therefore not the sort of public expression of support for Lance and his views that would make them even "symbolic speech." Since we find no significant speech elements in the transactions that the Commission is investigating, we hold that the FCPA's prohibition of such unsound banking practices in

connection with elections does not violate the first amendment.[7]

## VI

■ Lance next argues that section 441b is unconstitutionally vague. It has, of course, long been settled that "the terms of a penal statute must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties . . . ." *Connally v. General Construction Co.*, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926). According to Lance, section 441b's prohibition against making contributions or expenditures "in connection with any election" fails sufficiently to inform him of the boundaries of the proscribed conduct because of the vagueness of the phrase "in connection with any election." Thus, Lance contends that the statute is constitutionally infirm.

■ We do not, however, think it proper to resolve the merits of Lance's vagueness challenge at this time. The vagueness doctrine has been developed in the context of, and it is applicable to, penal statutes. When a statute imposing civil penalties is claimed to be vague, we believe a court's proper role is to construe the statute's language, if possible, and then apply the statute as construed. Viewed this way, Lance's vagueness argument is simply inapposite unless the FTC seeks to proceed against him in a criminal proceeding. As we have earlier indicated in our analysis of Lance's ex post facto argument, we are unwilling to assume that the present investigation of Lance will result in his criminal prosecution. *Supra* at 1139. Accordingly, we find Lance's vagueness argument presently unripe for adjudication and do not consider it on this appeal.

## VII

■ Lance's final argument is that section 441b, by imposing greater restrictions on national banks than on certain other entities, establishes a scheme of disparate treatment of banks that is impermissible under the fifth amendment. We consider this argument only in the context of the prohibition Lance has standing to challenge: that banks may not make political contributions in the forms of overdrafts, loans, and extensions of credit, out of the ordinary course of business.

To evaluate this equal protection claim of Lance's, we must first decide the appropriate test of the statute's validity under the equal protection component of the fifth amendment. Lance suggests that because speech, a fundamental right, is involved, this court must strike down section 441b unless it finds that the statute "imposes a selective restriction on expressive conduct [no] greater than is essential to the furtherance of a substantial governmental interest." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 102, 103, 92 S.Ct. 2286, 2293, 2294, 33 L.Ed.2d 212 (1972). But because we have already concluded that the Banks' contributions contain no cognizable elements of speech, *supra* at 1141, we think the statute must be upheld if there is a rational relationship between the prohibition Lance has standing to challenge and the purpose that prohibition serves. *See Marshall v. United States*, 414 U.S. 417, 94 S.Ct. 700, 38 L.Ed.2d 618 (1974). Since we have no difficulty in concluding that a prohibition against banks engaging in unsound banking practices is rational, we reject Lance's equal protection claim.

## VIII

Because we conclude that the provisions of section 441b that Lance has standing to challenge are not facially unconstitutional and that none of Lance's other objections to the subpoena have merit, we affirm the order of the district court enforcing the subpoena.

AFFIRMED.

---

7. We intimate no opinion concerning the constitutionality of any of the other prohibitions set out in section 441b. If the scope of the present FEC investigation expands to cover transactions suspected of violating any of the other prohibitions, Lance or one of the other subjects of the investigation–or even a third party subpoenaed to give testimony–might well, then, have standing to challenge those other prohibitions.

COLEMAN, Chief Judge, with whom GARZA, TATE and THOMAS A. CLARK, Circuit Judges, join, dissenting:

It seems obvious that Congress did not intend to authorize or empower THE FEDERAL ELECTION COMMISSION to regulate or investigate *state* elections. As to elections *per se*, the very name of the Commission delineates the scope of its jurisdiction. The Act names no offices except elective federal offices. Except for enforcing applicable federal constitutional amendments governing the franchise, Congress may not usurp the regulation and supervision of state elections. That would be a blatant rupture of the federal system ordained by the Constitution.

The Commission offers no claim to the contrary. It says that it is only investigating what may have been illegal loans by national banks for the purpose of influencing the outcome of an election.

Here, the election took place in 1974. The statute was not then in effect. Some of it became effective on January 1, 1975 and other parts were not enacted until 1976. Prior to January 1, 1975 there was no authority for civil enforcement of the prohibition against loans of the type here in question, *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 2086, 45 L.Ed.2d 26 (1975).

The statute, non-existent in 1974, subjects Lance to a "civil" penalty of from $5,000 to $600,000, depending on the existence or non-existence of wilfulness. The majority opinion says that the *ex post facto* features of this situation are not ripe for adjudication because the Commission might not seek such a fine. This reads the *ex post facto* prohibition too restrictively. I believe that the prohibition applies to the hazard as well as the fact. I cannot agree that one may be made to run the gauntlet on the argument that, after all, he may not get hurt.

The simply stated, easily understood, demand of Article I, section 9, clause 3 of the Constitution is that Congress may not alter the existing situation of an individual to his disadvantage, *Thompson v. Utah*, 170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061 (1898); *Burgess v. Salmon*, 97 U.S. 381, 24 L.Ed. 1104 (1878).

In any event, to subject a person to a deposition and the production of documents while he is kept in the dark as to what the government is actually driving at in the way of consequences would be, I think, an impermissible denial of due process.

Taking judicial notice of the records of the U. S. District Court for the Northern District of Georgia, in this Circuit, and the applicable statutes of limitations in federal criminal prosecutions, we need not close our eyes to the known fact that criminal prosecution is no longer a possibility in this case. The only hope of punishing Lance and his associates in this matter, or otherwise putting them to a disadvantage by the necessity for employing attorneys, etc., is to use the procedure which the Commission now seeks to invoke and which it would have this Court to enforce.

I see no point in abstractions or a lot of judicial dancing around. Going straight to the point, I would hold that Lance may not now be required to respond to these subpoenas. I would certainly extend the denial to anything which took place after election day, August 13, 1974, because it would not have been done for the purpose of influencing the election, which is the *sine qua non* of the legislation.

The majority opinion concedes that the matter in question has been exhaustively investigated by other agencies of the Government—not once but twice. There is no suggestion that the product of these investigations is unavailable to the Federal Election Commission. Therefore, I would deny enforcement on the additional ground that the subpoena amounts to nothing more than unnecessary harassment.

My view of the case, if correct, makes it unnecessary to reach or decide the constitutionality of the Act as to conduct taking place after its effective date.

I respectfully dissent.