**FEDERAL ELECTION COMMISSION,**
Petitioner-Appellee,

v.

**FLORIDA FOR KENNEDY COMMIT-
TEE, Respondent-Appellant.**

No. 80–6013.

United States Court of Appeals,
Eleventh Circuit.

Aug. 2, 1982.

Donald M. Middlebrooks, Miami, Fla., for respondent-appellant.

Charles N. Steele, Gen. Counsel, Miriam Aguiar, Jeffrey H. Bowman, Fed. Election Commission, Washington, D. C., for petitioner-appellee.

Before VANCE, KRAVITCH and CLARK, Circuit Judges.

VANCE, Circuit Judge:

This appeal presents delicate issues concerning the permissible scope of the Federal Election Commission's subpoena power. The Commission served a sweeping subpoena upon Appellant Florida for Kennedy Committee (FKC) as part of an investigation into the 1979 activities of nine "draft-Kennedy" organizations around the country. FKC refused to comply and, upon petition by the Commission, the district court enforced the subpoena. Although this case is one of first impression in this circuit, the questions presented here have been thoroughly considered by the United States Court of Appeals for the District of Columbia circuit in a companion case to this

one. *See Federal Election Commission v. Machinists Non-Partisan Political League,* 655 F.2d 380 (D.C.Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 397, 70 L.Ed.2d 213 (1981). We substantially agree with that court and conclude that the activities of the Florida for Kennedy Committee are outside the jurisdiction of the Federal Election Commission. Accordingly, we reverse the order enforcing the subpoena.

## I.

In May 1979 a group of Florida citizens formed FKC, the sole purpose of which was to encourage Senator Edward M. Kennedy to seek the Democratic Party nomination for President of the United States. FKC was one of numerous draft-Kennedy groups that sprang up nationwide during the spring of 1979, all of which were ostensibly independent. Its stated goal was to influence the outcome of a nonbinding straw poll that was to be held at the Florida State Democratic Convention in November 1979. FKC hoped that a strong pro-Kennedy vote in this party referendum would persuade Senator Kennedy to declare his candidacy for the party nomination.

Throughout the spring and summer of 1979, FKC solicited contributions and expended fairly large sums of money in its effort to convince Senator Kennedy to run. A major contributor to FKC was the Machinists Non-Partisan Political League (MNPL), the political action arm of the International Association of Machinists. Despite having supported the election of Jimmy Carter in 1976, the MNPL had become disenchanted with the policies of the Carter Administration and by February 1979 had begun actively supporting the formation and operation of various draft-Kennedy groups around the country. Between May and November 1979 the MNPL

contributed over $30,000 to different draft-Kennedy groups, including FKC. Although FKC labored throughout the summer on his behalf, Senator Kennedy continued to support President Carter and at least once specifically disavowed its activities. On October 29, 1979, however, Senator Kennedy announced his candidacy for the party nomination and the activities of FKC ceased.

On October 4, 1979 the Carter-Mondale Presidential Committee, Inc. filed a complaint with the FEC. The complaint alleged that FKC was a political committee within the meaning of the Federal Election Campaign Act of 1971[1] and was affiliated with the eight other draft-Kennedy groups that had accepted contributions from the MNPL. *See* 2 U.S.C. §§ 431(d), 433, 441a(a)(5). The Carter-Mondale complaint alleged that FKC had violated the campaign laws by failing to disclose its affiliation with the other draft-Kennedy groups. The Carter-Mondale committee further complained that these allegedly affiliated draft-Kennedy groups were subject to a combined contribution restriction of $5,000 per contributor, a restriction that had been violated when the MNPL gave a combined total of more than $30,000 to the various groups.[2] *See* 2 U.S.C. §§ 441a(a)(2)(C), 441a(f).

On October 19, 1979 the Commission notified FKC that it had "reason to believe" that violations of the federal campaign laws had occurred. In accord with the Commission's procedures, FKC moved on November 1, 1979 to dismiss the Carter-Mondale complaint, arguing that FKC was a draft committee and not a political committee within the meaning of the Act. Consequently, FKC argued, neither the Act's reporting requirements nor contribution limitations applied to it. The FEC did not rule immediately on this motion, but instead, on November 5, 1979 served the sweeping agency

---

**1.** 2 U.S.C. §§ 431–441j. All references in this opinion to the Federal Election Campaign Act are to the provisions of the Act that were operative prior to the effective date of the Federal Election Campaign Act Amendments of

1979, Pub.L.No.96–187, 93 Stat. 1339 (Jan. 8, 1980).

**2.** There is no allegation made that the MNPL

subpoena that is the basis of this appeal.[3] FKC moved to quash the subpoena. On November 29, 1979 the FEC denied both motions.

On December 24, 1979, after FKC refused to comply with the Commission's subpoena, the FEC instituted the present action to enforce its subpoena in the United States District Court for the Southern District of Florida. FKC sought a plenary hearing to challenge the scope of the FEC's jurisdiction over draft groups. On May 2, 1980, however, the district court ruled that the subpoena enforcement proceeding was not the proper forum in which to challenge the FEC's jurisdiction or to raise constitutional objections to the subpoena. 492 F.Supp. 587. The court subsequently enforced the

subpoena on November 6, 1980 and this appeal followed.

## II.

The FEC argues that FKC cannot properly contest the subpoena in the enforcement proceedings below. The FEC contends that because the investigation was arguably within the scope of its statutory duties, the information sought by the subpoena was relevant to its investigation, and the subpoena was not overly broad or indefinite the court correctly enforced the FEC subpoena summarily. *See United States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S.Ct. 357, 368, 94 L.Ed. 401 (1950).

 In granting the exclusive power to enforce administrative subpoenas to the federal courts,[4] Congress manifested its in-

---

donated more than $5,000 to any single draft-Kennedy organization.

3. The FEC subpoena sought production of the following information:
 1. All documents and materials (including but not limited to letters, memoranda, minutes, notes, and records of telephone conversations) relating to meetings, discussions, correspondence, or other communications between any official, employee, staff member, volunteer, organizer, or agent of FKC and any of the following persons or organizations or their officials, employees, staff members, volunteers, organizers, or agents:
 a. Committee for Alternative to Democratic Presidential Candidate (Iowa)
 b. New Hampshire Democrats for Change
 c. Minnesotans for a Democratic Alternative
 d. Illinois Citizens for Kennedy
 e. D.C. Committee for a Democratic Alternative
 f. Democrats for Change—1980 (D.C.)
 g. Citizens for Democratic Alternatives in 1980 (D.C.)
 h. National Call for Kennedy
 i. MNPL
 j. International Association of Machinists
 k. Mark A. Siegel
 l. Marjorie Phyfe
 m. William W. Winpisinger (I.A.M. President).
 2. All documents and materials (including but not limited to letters, memoranda (internal or otherwise), minutes, notes, records of telephone conversations, newsletters, and publications) concerning the formation, organizational structure, and staff assignments of FKC or any of the organizations listed in request 1.

3. All documents and materials relating to any fundraising activities of FKC in the States of Iowa, New Hampshire, Illinois, California and Minnesota, and the District of Columbia, including but not limited to writings indicating who was involved in organizing or coordinating any such activities and who was contacted in the listed states.
4. All articles of incorporation, by-laws, rules, regulations, procedural manuals, policy statements, governing instruments, or other documentation of policies or procedures of FKC.
5. All telephone bills or other records of telephone calls made by FKC or by any of its officials, employees, staff members, volunteers, organizers, or agents.
6. All documents and materials (including but not limited to airplane, bus, or train ticket receipts, automobile rental and gas receipts, bills for lodging and accommodations, travel authorization requests, and vouchers) relating to travel by officials, employees, staff members, volunteers, organizers, or agents of FKC.
7. A list of all officials, employees, staff members, volunteers, organizers, and agents of FKC. For each individual listed please indicate the title or position held and the dates of service.
8. The date of organization of FKC.
9. A list of the telephone numbers of FKC and of every official, employee, staff member, volunteer, organizer, and agent of FKC. For each number listed please indicate the listed or known name of the person to whom each number belongs.

4. *Compare* 2 U.S.C. § 437d(a)(3) (FEC may issue administrative subpoenas in the course of

tention that the courts exercise independent judgment in evaluating agency subpoenas. *See United States v. Security State Bank & Trust*, 473 F.2d 638, 641 (5th Cir. 1973).[5] To avoid delays that might paralyze an agency's ability to investigate, however, the federal courts have created a self-imposed limitation upon the degree to which they will scrutinize agency requests to enforce subpoenas. *See Hannah v. Larche*, 363 U.S. 420, 443–44, 80 S.Ct. 1502, 1515, 4 L.Ed.2d 1307 (1960). As a general rule, an administrative subpoena should be enforced "if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." *United States v. Morton Salt Co.*, 338 U.S. at 652, 70 S.Ct. at 368.

■ The salutary policies of judicial and administrative efficiency that underlie the *Morton Salt* rule do not, however, require that the courts limit their scrutiny of agency subpoena requests in every case. *Cf. Federal Election Commission v. Lance*, 617 F.2d 365, 369 (5th Cir. 1980) (courts should examine policies behind summary enforcement of subpoenas), *supplemental opinion*, 635 F.2d 1132 (5th Cir.) (en banc), *appeal dismissed and cert. denied*, 453 U.S. 917, 101 S.Ct. 3151, 69 L.Ed.2d 999 (1981). We agree with the District of Columbia circuit that this subpoena has several characteristics that make it necessary for the court to be certain of the FEC's investigative authority before enforcing it, although such scrutiny may entail some delay in enforcement. *See Federal Election Commission v. Machinists Non-Partisan Political League*, 655 F.2d at 386.

First, the activities that the FEC seeks to investigate differ profoundly in terms of constitutional significance from the activities that are generally the subject of investigation by other federal administrative agencies. The sole purpose of the FEC is to regulate activities involving political expression, the same activities that are the

primary object of the first amendment's protection. The risks involved in government regulation of political expression are certainly evident here. The FEC subpoena seeks disclosure of all members and volunteers of FKC, an organization the express purpose of which is to defeat the incumbent President. As the Supreme Court stated long ago:

> It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute [an] effective ... restraint on freedom of association .... This Court has recognized the vital relationship between freedom to associate and privacy in one's associations.... Inviolability of privacy in group association may in many circumstances be indispensible to preservation of freedom of association ....

*NAACP v. Alabama*, 357 U.S. 449, 462, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958), *quoted in Federal Election Commission v. Machinists Non-Partisan Political League*, 655 F.2d at 389; *see also Marshall v. Stevens People & Friends for Freedom*, 669 F.2d 171, 176–79 (4th Cir. 1981) (court closely scrutinizes administrative subpoena implicating first amendment rights notwithstanding general rule of *Morton Salt*), *cert. denied*, —— U.S. ——, 102 S.Ct. 1432, 71 L.Ed.2d 651 (1982). The Supreme Court has also made it clear that a higher degree of scrutiny must attach before courts can compel disclosure of information that may impinge upon these first amendment associational rights:

> It is particularly important that the exercise of the power of compulsory process be carefully circumscribed when the investigative process tends to impinge upon such highly sensitive areas as freedom of speech or press, freedom of political association, and freedom of communication of ideas ....

its investigations) *with* 2 U.S.C. § 437d(b) (federal district court may enforce subpoena upon petition by FEC).

5. This circuit has adopted as binding precedent the decisional law of the former fifth circuit that was published before October 1, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

*Sweezy v. New Hampshire,* 354 U.S. 234, 245, 77 S.Ct. 1203, 1209, 1 L.Ed.2d 1311 (1957);[6] *see Buckley v. Valeo,* 424 U.S. 1, 14, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976) (government impingement upon the rights of individuals to speak and associate for political purposes can be tolerated only after the most exacting judicial scrutiny).

These constitutional considerations do not, of course, preclude the FEC from investigating activities that implicate the freedom to associate. They do, however, require that the FEC prove to the satisfaction of the courts that it has statutory investigative authority over FKC. The

danger of treading too quickly or too blithely upon cherished liberties is too great to demand any less of the FEC.[7]

There is an additional reason to conclude that the *Morton Salt* rule does not prohibit probing judicial scrutiny of the FEC's investigative authority in this case. Unlike the typical case, the FEC's authority to issue this subpoena can be determined without reference to any further factual development. Because the FEC has conceded that Senator Kennedy was not a candidate during the period in which the bulk of FKC's activities occurred[8] and that FKC

---

**6.** We do not deem it of any significance that *Sweezy* concerned the use of state legislative summonses. Like a summons, the subpoena is a form of compulsory process. Additionally, there is no logical reason to accord greater judicial deference to an administrative agency's subpoena than to a subpoena issued in the course of a state legislative investigation.

**7.** In a supplemental brief submitted to this court, the FEC argues that the rule of *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), which requires strict judicial scrutiny of official efforts to obtain disclosure of individuals associated with a political organization, does not apply unless the target organization makes a factual showing that its membership is likely to be chilled in the exercise of associational rights as a result of the compelled disclosure. To support that proposition, the FEC cites *Buckley v. Valeo,* 424 U.S. 1, 69–70, 96 S.Ct. 612, 658–659, 46 L.Ed.2d 659 (1976). The FEC contends that FKC has made no factual showing of probable chilling effects, and therefore cannot invoke the strict judicial scrutiny required by *NAACP v. Alabama.*

We believe that the FEC has misapplied the cited portion of *Buckley* to this case. In that portion of the opinion, the Supreme Court addressed the contention by minor parties explicitly covered by the Act that extension of the disclosure provisions of the Act to them was unconstitutional under *NAACP v. Alabama.* The Court dismissed that contention holding that forced disclosure of membership information from organizations covered by the Act is unconstitutional under *NAACP v. Alabama* only when the target organization makes an initial factual showing of likely chilling effects. So stated, this holding in *Buckley* is inapplicable to the instant case. The objection lodged against the subpoena is not that FKC members will suffer chilling effects as a result of the required disclosure. Rather, FKC contends that as a matter of statutory construction, draft committees such as itself are not covered by the Act. Our initial holding in this case is that

courts should not summarily enforce an administrative subpoena when there is a question regarding the statutory jurisdiction of the agency to investigate the organization and when resolution of that question will require the courts to construe the relevant statute in light of first amendment issues that would be raised by extending the statute to cover that organization. *See Federal Election Comm'n v. Lance,* 617 F.2d 365, 374 (5th Cir. 1980), *supplemental opinion,* 635 F.2d 1132 (5th Cir.) (en banc), *appeal dismissed and cert. denied,* 453 U.S. 917, 101 S.Ct. 3151, 69 L.Ed.2d 999 (1981); *Federal Election Comm'n v. Machinists Non-Partisan Political League,* 655 F.2d 380, 389 (D.C.Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 397, 70 L.Ed.2d 213 (1981). *But cf. SEC v. Wall Street Transcript Corp.,* 422 F.2d 1371, 1375, 1380–81 (2d Cir.) (question whether a publication is a "bona fide newspaper" exempt from the disclosure requirements of the Investment Advisors Act of 1940 is a question in the first instance for the agency), *cert. denied,* 398 U.S. 958, 90 S.Ct. 2170, 26 L.Ed.2d 542 (1970).

If, hypothetically, draft committees such as FKC were explicitly included within the coverage of the Act, then FKC and groups like it would have to demonstrate likely chilling effects in order to invoke the protection of *NAACP v. Alabama. See Marshall v. Stevens People & Friends for Freedom,* 669 F.2d 171 (4th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1432, 71 L.Ed.2d 651 (1982).

**8.** In its brief, the FEC argued that a determination of the Act's coverage involves questions of fact and law. We do not dispute this assertion as a general proposition. At oral argument, however, the FEC conceded the relevant factual basis for a decision as to the FEC's jurisdiction. *See also Federal Election Comm'n v. Machinists Non-Partisan Political League,* 655 F.2d 380, 390 (D.C.Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 397, 70 S.Ct. 213 (1981):

The Commission has already determined that Senator Kennedy was *not* a candidate for

was a bona fide draft group, the only issue to be resolved is purely a legal question of statutory construction: do the disclosure requirements of the Federal Election Campaign Act of 1971 apply to draft committees? Resolution of that issue neither requires the parties to engage in time-consuming discovery nor requires the district court to construct a lengthy record. None of the efficiency considerations favoring summary initial review, therefore, is implicated when the legal issue is distilled as it is in this case, and nothing will be gained by postponing judicial review of that issue.[9] *See Federal Election Commission v. Machinists Non-Partisan Political League,* 655 F.2d at 390; *Federal Election Commission v. Lance,* 617 F.2d at 374; *Federal Trade Commission v. Miller,* 549 F.2d 452, 460 (7th Cir. 1977); *cf. NLRB v. Brown,* 380 U.S. 278, 290–92, 85 S.Ct. 980, 987–88, 13 L.Ed.2d 839 (1965) (when judicial review is not of factual issue but is one of legal interpretation there is less justification for deference to agency determination); 7 J. Moore, Moore's Federal Practice ¶ 81.06[1] (1973) (court is free to be flexible in applying rules of procedure to subpoena enforcement proceedings). Accordingly, the district court erred in not inquiring into the FEC's specific statutory jurisdiction over FKC in this case.

### III.

■ The FEC investigation in question is to determine whether FKC was an affiliated political committee within the meaning of 2 U.S.C. § 433 and whether it was a political committee that received excess contributions from the MNPL in violation of 2 U.S.C. § 441a(f). Thus, the only asserted basis of FEC jurisdiction is its claim that FKC, an organization seeking to draft someone to become a candidate for office, is a political committee within the meaning of the Act.

The FEC urges us to focus on the express provisions of the Act to determine the meaning of political committee. The Act defines the term political committee as a committee which receives contributions or makes expenditures in excess of $1,000 per year. 2 U.S.C. § 431(d). The Act further defines an expenditure or contribution as a "gift, loan, advance, or payment of money made for the purpose of influencing the nomination for election, or the election of any person to Federal office." 2 U.S.C. §§ 431(e), (f). The FEC argues that these statutory provisions, when considered in conjunction, require a finding that FKC is a political committee because it spent more than $1,000 to influence the Democratic party nomination. Although superficially appealing, this reading of the Act ignores contrary precedent and creates constitutional problems that could be avoided by a narrower interpretation of the Act.

The seminal case interpreting the Federal Election Campaign Act of 1971 is *Buckley v. Valeo,* 424 U.S. at 1, 96 S.Ct. at 612, 46 L.Ed.2d at 659, which declared parts of the Act to be violative of the first amendment. As the Supreme Court has subsequently stated, "*Buckley* identified a single narrow

President as of August 17, 1979, but it nevertheless asserts that "draft-Kennedy" activities both before and after that date are controlled by FECA's reporting and contribution provisions. FEC Advisory Opinion 1979–40 (Aug. 17, 1979). *See also* FEC Advisory Opinion 1979–49 (Oct. 5, 1979). No matter what facts it finds through this investigation, the requisite jurisdiction for the investigation itself must stand or fall on the purely legal claim that "draft" groups are "political committees" under FECA.

**9.** Additionally, subjects of FEC investigations generally are not as likely to challenge subpoenas issued for the limited purpose of finding facts to determine whether the FEC has juris-

diction to continue its investigation. As a practical matter, information of that type will have to be released by the subject of the inquiry at some point in the judicial process to justify its claim of FEC overreaching. Conversely, when no factual matter may be gleaned to shed further light upon the question of the FEC's jurisdiction, the subjects of the inquiry are far more likely to remain resolute and risk contempt sanctions rather than release the requested information. Because of the high probability of such protracted proceedings when *purely* legal issues are raised, the efficiency considerations of *Morton Salt* and *Hannah* are better served by thorough judicial scrutiny of the subpoena at the outset of the enforcement process.

exception to the rule that limits on political activity were contrary to the First Amendment. The exception relates to the perception of undue influence of large contributions to a *candidate*." *Citizens Against Rent Control v. City of Berkeley*, —— U.S. ——, ——, 102 S.Ct. 434, 437–38, 70 L.Ed.2d 492 (1981) (emphasis in original); *see Let's Help Florida v. McCrary*, 621 F.2d 195, 199 (5th Cir. 1980). In and of itself, the Supreme Court's construction of the Act focusing upon *candidates* convinces us that unauthorized groups electioneering on behalf of someone who is not yet a candidate for federal office cannot be covered by the Act. The Supreme Court's specific discussion of the term political committee reinforces our conclusion:

> To fulfill the purposes of the Act [political committees] need only encompass organizations that are *under the control of a candidate or the major purpose of which is the nomination or election of a candidate.* Expenditures of candidates and of "political committees" so construed can be assumed to fall within the core area sought to be addressed by Congress. They are, by definition, campaign related.

*Buckley v. Valeo*, 424 U.S. at 79, 96 S.Ct. at 663 (emphasis added) (citing *United States v. National Committee for Impeachment*, 469 F.2d 1135, 1139–42 (2d Cir. 1972); *American Civil Liberties Union, Inc. v. Jennings*, 366 F.Supp. 1041, 1055–57 (D.D.C. 1973) (three judge court), *vacated sub nom. Staats v. American Civil Liberties Union, Inc.*, 442 U.S. 1030, 95 S.Ct. 2646, 45 L.Ed.2d 686 (1975)). This definition of political committee clearly forecloses the technical argument proffered by the FEC. Accordingly, FKC can be subject to the FEC's

jurisdiction only if Senator Kennedy was a candidate during the period of FKC's activities. The FEC has conceded, however, that Senator Kennedy was not a candidate for the period relevant to this subpoena, so its efforts to extend jurisdiction over what it concedes to be purely a draft group not under the control of a candidate must fail.[10]

We find further support for our conclusion in longstanding canons of statutory construction. Courts are under the duty to avoid, if possible, construing a statute in a manner that creates constitutional problems. As the former fifth circuit has said before,

> [i]f the interpretation complained of "presents a significant risk that the First Amendment will be infringed," any ambiguity in the statute is construed in a manner to avoid such constitutional problems. . . . The obvious aim of this process is to avoid, if at all possible, ruling on the constitutionality of a statute. The reasons for this aversion to exercising judicial review over legislative acts have been explained many times by the Supreme Court. *See, e.g., Rescue Army v. Municipal Court*, 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947); *Ashwander v. TVA*, 297 U.S. 288, 345, 56 S.Ct. 466, 482, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

*EEOC v. Southwestern Baptist Theological Seminary*, 651 F.2d 277, 285 (5th Cir. 1981); *accord United States v. Rumely*, 345 U.S. 41, 45, 73 S.Ct. 543, 545, 97 L.Ed. 770 (1953) (quoting *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932)); *United States v. Thomas*, 567 F.2d 299, 300 (5th Cir. 1978). Suffice it to say that sub-

---

**10.** In addition, the Supreme Court narrowly construed the term "contribution" for purposes of the disclosure requirements of 2 U.S.C. § 434:

> [W]hen the maker of the expenditure is not within these categories—when it is an individual other than a candidate or a group other than a "political committee"—the relation of the information sought to the purposes of the Act may be too remote. To insure that the reach of § 434(e) is not impermissibly broad, we construe "expenditure"

for purposes of that section in the same way we construed the terms of § 608(e)—to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate. This reading is directed precisely to that spending that is unambiguously related to the campaign of a particular federal candidate.

*Buckley v. Valeo*, 424 U.S. 1, 79–80, 96 S.Ct. 612, 663, 49 L.Ed.2d 659 (1976) (footnotes omitted).

stantial constitutional questions would arise were we to adopt the FEC's position and hold that draft groups such as FKC were covered by the Act. We of course intimate no opinion as to whether the extension of the Act to reach draft groups would violate the first amendment. We merely require that Congress express clearly its intent that the campaign laws sweep so broadly. As the District of Columbia circuit stated,

> In this delicate first amendment area, there is no imperative to stretch the statutory language, or read into it oblique inferences of Congressional intent to include "draft" groups. Achieving a reasonable, constitutionally sound conclusion in this case requires just the opposite. "It is our duty in the interpretation of federal statutes to reach a conclusion which will avoid serious doubt of their constitutionality." Unless, therefore, Congress made reasonably clear its intent to bring "draft" groups—organizations whose contributions and expenditures do not relate to an identifiable "candidate" —under the contribution limitations of section 441a, we must decline to extend that provision to cover such groups so as to avoid the constitutional problems which *Buckley* and its lower court predecessors were able to avoid by narrowly construing the term "political committee."

*FEC v. Machinists Non-Partisan Political League*, 655 F.2d at 394 (footnote omitted).[11]

The FEC has no jurisdiction to investigate the activities of FKC on behalf of a non-candidate. The order of the district court is reversed.

REVERSED.

CLARK, Circuit Judge, dissenting:

The majority in holding that "draft committees" are outside the jurisdiction of the Federal Election Commission fails to con-sider the plain intent of Congress in enacting the statute, misapplies *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 S.Ct. 659 (1976), and imagines dangers to first amendment associational rights which have no basis in reality. Therefore, I must dissent.

The Federal Election Commission was established by Congress to act as a watchdog to forestall certain misconduct in the federal election process. 2 U.S.C. § 437c. It has eight members, six of whom have the power to vote on matters before it (there are two *ex officio* members, the Secretary of the Senate and the Clerk of the House of Representatives). These six are appointed by the President by and with the consent of the Senate for six-year terms. In furtherance of the Congressional mandate that political contributions be limited and sources identified, the Federal Election Commission has the power to, *inter alia*, conduct the following activities:

(a) The Commission has the power—

(1) to require, by special or general orders, any person to submit in writing such reports and answers to questions as the Commission may prescribe; and such submission shall be made within such a reasonable period of time and under oath or otherwise as the Commission may determine;

(2) to administer oaths or affirmations;

(3) to require by subpena [sic], signed by the chairman or the vice chairman, the attendance and testimony of witnesses and the production of all documentary evidence relating to the execution of its duties;

(4) in any proceeding or investigation, to order testimony to be taken by deposition before any person who is designated by the Commission and has the power to administer oaths and, in

---

**11.** We note that Congress has amended the Act to cover for some purposes draft groups such as FKC, but that the effective date of the amendment was after the period of FKC's activities. *Compare* 2 U.S.C. § 434(a)(1) (1978) *with* 2 U.S.C. § 434(a)(1) (1981) (Congress de-leted requirement that political committee support a candidate before disclosure obligations of Act attached). *See* H.R.Rep.No.96–422, 96th Cong., 1st Sess. 15, *reprinted in* 1979 U.S.Code Cong. & Ad.News 2860, 2874.

such instances, to compel testimony and the production of evidence in the same manner as authorized under paragraph (3) of this subsection;

2 U.S.C. § 437d.

The instant dispute involves an attempt to investigate the Florida for Kennedy Committee. Prior to any activity, the committee registered with the Federal Election Commission as a political committee pursuant to 2 U.S.C. § 431 without any reservations about being subject to the Federal Election Campaign Act. This committee received contributions and made expenditures in excess of a quarter million dollars. The Machinists "Non-Partisan" Political League, the political action arm of the International Association of Machinists, was a substantial donor to the various "draft Kennedy" movements around the country. If these movements were affiliated, this contributor would have been limited to one $5,000 donation under the provisions of 2 U.S.C. § 441a(a)(1)(c). The subpoena issued by the Commission in the present case was issued in order to further its investigation of the possible illegality of these contributions and their receipt by various committees.

The Florida for Kennedy Committee is a political committee within the FEC's jurisdiction. Under the former[1] 2 U.S.C. § 431(d), a political committee was defined as a committee which receives contributions or makes expenditures in excess of $1,000 per year. Former 2 U.S.C. §§ 431(e) and (f) in pertinent part state:

(e) "contribution"—

(1) means a gift, subscription, loan, advance, or deposit of money or anything of value made for the purpose of—

(A) influencing the nomination for election, or election, *of any person* to Federal office or for the purpose of influencing the results of a primary held for the selection of delegates to a national nominating convention of a political party, or

(B) influencing the result of an election held for the expression of a preference for the *nomination of persons* for election to the office of President of the United States;

. . . .

(f) "expenditure"—

(1) means a purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made for the purpose of—

(A) influencing the nomination for election, or the election, *of any persons* to Federal office, or to the office of presidential and vice-presidential elector; or

(B) influencing the results of a primary election held for the selection of delegates to a national nominating convention of a political party or for the expression of a preference for the *nomination of persons* for election to the office of President of the United States;

(emphasis supplied). In the instant case, Florida for Kennedy undertook activities aimed at obtaining the Democrat presidential nomination for Senator Kennedy.

During 1979, the Carter-Mondale Committee filed a complaint with the Federal Election Commission against the Florida for Kennedy Committee. Thus, the pertinent enforcement provisions of 2 U.S.C. § 437 were triggered:

(a)(1) Any person who believes a violation of this Act or of chapter 95 or chapter 96 of Title 26 has occurred may file a complaint with the Commission. Such complaint shall be in writing, shall be signed and sworn to by the person filing such complaint, and shall be notarized. Any person filing such a complaint shall be subject to the provisions of section 1001 of Title 18. The Commission may not conduct any investigation under this section, or take any other action under this section, solely on the basis of a com-

---

1. 2 U.S.C. § 431 was revised in 1980. These definitions were slightly changed and a renum- bering of its provisions was made. However, the main thrust of the Act remains unchanged.

plaint of a person whose identity is not disclosed to the Commission.

(2) The Commission, upon receiving a complaint under paragraph (1), and if it has reason to believe that any person has committed a violation of this Act or of chapter 95 or chapter 96 of Title 26, or, if the Commission, on the basis of information ascertained in the normal course of carrying out its supervisory responsibilities, has reason to believe that such a violation has occurred, shall notify the person involved of such alleged violation and shall make an investigation of such alleged violation in accordance with the provisions of this section.

(3)(A) Any investigation under paragraph (2) shall be conducted expeditiously and shall include an investigation, conducted in accordance with the provisions of this section, of reports and statements filed by any complainant under this subchapter, if such complainant is a candidate.

2 U.S.C. § 437g. Soon afterward, the Federal Election Commission found that it had reason to believe that the Florida for Kennedy Committee and the International Association of Machinists had violated the Federal Election Campaign Act, a prerequisite to investigation under 2 U.S.C. § 437g(a)(2). Therefore, the Federal Election Commission was operating under procedures mandated by statute. It was investigating the contributions received by a political committee seeking to influence the election of a person to federal office. It had begun this investigation solely upon a signed complaint, as required by statute. The Federal Election Commission did not initiate the investigation on its own.

The language of the statute is quite clear. In 2 U.S.C. § 431, Congress first defines the term "candidate":

(b) "candidate" means an individual who seeks nomination for election, or election, to Federal office, whether or not such individual is elected, and, for purposes of this paragraph, an individual shall be deemed to seek nomination for election, or election, if he has (1) taken the action necessary under the law of a State to qualify himself for nomination for election, or election, to Federal office, or (2) received contributions or made expenditures, or has given his consent for any other person to receive contributions or make expenditures, with a view to bringing about his nomination for election, or election, to such office;

2 U.S.C. § 431(b). Shortly thereafter, the term "person" is defined:

(h) "person" means an individual, partnership, committee, association, corporation, labor organization, and any other organization or group of persons;

2 U.S.C. § 431(h). Throughout this and related statutes, the terms "candidate" and "person" are frequently used. However, in its definition of the terms "expenditure" and "contribution" (which are the key elements in determining the function of "political committee"), Congress did not use the term "candidate." Rather, as noted above, both "contribution" and "expenditure" are defined in terms of influencing the nomination "of any person." 2 U.S.C. §§ 431(e), (f). It is undisputed that the Florida for Kennedy Committee had as its purpose "influencing the nomination for election" of Senator Kennedy "to Federal office" and that it thus fits squarely within 2 U.S.C. § 431(e). Congress clearly chose to use the broader term "person" rather than the technical "candidate." By doing so, Congress intended[2] to give the FEC broad authority

**2.** The District of Columbia Circuit in *Machinists Non-Partisan Political League*, makes the simply incredible statement that:

Congress "has voiced its wishes in muted strains and left it to the Courts to discern the theme in the cacophony of political understanding."

655 F.2d 380, 394 (D.C.Cir.1981). This is a chimerical distortion given the absolutely clear

language of the statute itself. That court's examination of the legislative history in that case is improper under such cases as *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184, n.29, 98 S.Ct. 2279, 2296, 57 L.Ed.2d 117 (1978), and *Ex Parte Collett*, 337 U.S. 55, 61, 69 S.Ct. 944, 947, 93 L.Ed. 1207 (1949). These cases stand for the proposition that when confronted with a statute that is clear on its face, the courts do

in this area. One of the Senate reports on the Federal Election Campaign Act indicates the spirit in which the law was passed: "Disclosure, if it is to be effective must mean total disclosure, and therefore the Committee has sought to reach every kind of political activity." S.Rep.No.92–229 (1971), *reprinted in* [1972] U.S.Code Cong. & Ad.News, 1773, 1821, 1823.[3] Although "draft committees" were unheard of at the time of the passage of the Act, *see Federal Election Commission v. Machinists Non-Partisan League,* 655 F.2d 380, 394 n.27 (D.C.Cir.1981), it is reasonable to assume that Congress used this broad language in anticipation of attempts springing from the fertile minds of politicians to circumvent the Act. "Draft committees" fall within the authority Congress delegated to the Federal Election Commission, as such groups make expenditures and accept contributions with the purpose of influencing the nomination of a *person* to Federal office.

This is the only reasonable interpretation that may be given to the statute. In enacting this federal elections law, Congress sought to open to inspection by the public the sources of funds used to influence the nomination of persons to public office. To leave in the dark free from public view a device such as a "draft committee" is anomalous. It is clearly prone to abuse. The face of the statute and its underlying policy considerations make clear that Congress intended "draft committees" to fall within FEC jurisdiction.

The majority, quoting from *EEOC v. Southwestern Baptist Theological Seminary,* 651 F.2d 277, 285 (5th Cir. 1981), states that if "the interpretation [of a statute] complained of 'presents a significant risk that the First Amendment will be infringed,' any ambiguity in the statute is construed in a manner to avoid such constitutional problems." But there is no ambiguity and further there is no threat to first amendment rights as will be later discussed. The plain truth is that the Congressional intent is extremely clear. Congress intended to regulate "draft committees" and the court today ignores its intentions. Where the face of a statute is clear, we are bound to interpret it as Congress wrote it. *See Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978).[4]

not look to legislative history as a guide to its meaning, unless from the legislative history it is clear that Congress did not intend to employ the words it used.

Further, the District of Columbia Circuit states that the "legislative history of the term 'political committee' is, in a word, uninformative, at least prior to 1979." 655 F.2d at 394. The court goes on to concede that even the 1979 amendments are "not dispositive" of the issue. *Id.* The disregarding of the clear language of the statute on the basis of a concededly "uninformative" and "not dispositive" legislative history is directly counter to such recent Supreme Court opinions as *Bread Political Action Committee v. Federal Election Commission,* —— U.S. ——, ——, 102 S.Ct. 1235, 1238, 71 L.Ed.2d 432 (1982), and *Consumer Products Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

**3.** It is clear under *Buckley v. Valeo, supra,* that not *every* kind of political activity may be reached by the Act and withstand constitutional muster. This does not, however, detract from the intent of Congress to make the Act as broad as possible.

**4.** Both the majority today and the District of Columbia Circuit in *Machinists Non-Partisan Political League* are guilty of the most serious sort of judicial legislation. Justice Frankfurter once wrote:

> [T]he courts are not at large.... They are under the constraints imposed by the judicial function in our democratic society. As a matter of verbal recognition certainly, no one will gainsay that the function in construing a statute is to ascertain the meaning of words used by the legislature. To go beyond it is to usurp a power which our democracy has lodged in its elected legislature.... A judge must not rewrite a statute, neither to enlarge nor to contract it.
>
> Whatever temptations the statesmanship of policy-making might wisely suggest, construction must eschew interpolation and evisceration. He must not read in by way of creation. He must not read out except to avoid patent nonsense or internal contradiction.... [T]he only sure safeguard against crossing the line between adjudication and legislation is an alert recognition of the necessity not to cross it and instinctive, as well as trained, reluctance to do so.

Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Colum.L.Rev. 527, 533, 535

There is no significance to the fact that "draft committees" are not mentioned in the statute. The District of Columbia Circuit apparently attributed some importance to this fact in *Machinists Non-Partisan Political League* :

> Indeed not even a whisper about limiting contributions to "draft" groups has ever been heard in the legislative history of the FECA. It is therefore clear that Congress has never acted expressly to bring "draft" groups within the coverage of contribution limitations.

655 F.2d at 395. It should be noted that Congress could not have considered the issue because no significant draft groups existed at the time when these provisions were made law. *Id.* at 394, n.27.

*Gemsco v. Walling*, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945), sheds some further light upon this point. *Gemsco* involved a challenge to the authority of the Department of Labor to regulate certain practices under section 8(f) of the Fair Labor Standards Act, 29 U.S.C. § 208(f). This Act established a minimum wage of forty cents an hour. This statute also gave the Administrator of the Labor Department's Wage and Hour Division the power to enter orders and enforce them in order to carry out the purposes of the Act. Certain manufacturers attempted to circumvent this law by giving employees "industrial homework" at less than the minimum wage. The Administrator prohibited the practice, even though the statute made no reference to "industrial homework." The Court upheld this action. It gave no weight to the omission of "industrial homework" from the statute, when the purpose of the statute and its language were clearly designed to prevent such artful circumventions. 324 U.S. at 259–63, 65 S.Ct. at 614–16. The *Gemsco* analysis is precisely applicable in the instant case; as I have noted above, the Congressional purpose as shown by the plain language of the FECA is to prevent loopholes such as that opened today.

(1947). These sentiments in no way characterize the action of this court today nor those of the District of Columbia Circuit. The mandate of *United States v. Wiltberger*, 5 Wheat. (18 U.S.) 76, 95–96, 5 L.Ed. 37 (1820), one of the

The majority cites *Buckley* in support of its decision. This reliance upon *Buckley* is misplaced. The Supreme Court in *Buckley* construed the statute so as to avoid constitutional problems while at the same time enforcing those parts of the statute "within the core area sought to be addressed by Congress." 424 U.S. at 80, 96 S.Ct. at 663. The word "candidate" was not used in *Buckley* in the technical sense of the term as provided in the FECA. The term "candidate" in *Buckley* was intended by that Court to be read in a broader light. Otherwise, a significant portion of the "core area" of Congressional concern would be outside the coverage of the Act, a construction which the Supreme Court rejected.

Giving a slightly broader construction to the term "candidate," in other words the meaning used in everyday parlance, it is clear that the regulation of draft committees by the FEC would be constitutional. Indeed, there is a good deal of support within *Buckley* for the proposition that when the Supreme Court used the term "candidate," it meant the everyday meaning of the word. For example, the Court stated:

> To insure that the reach of § 434(e) is not impermissibly broad, we construe "expenditure" for purposes of that section in the same way we construed the terms of § 608(e)—to reach only funds used for communications that expressly advocate the election or defeat of a *clearly identified candidate.* This reading is directed precisely to that spending that is unambiguously related to the campaign of a *particular federal candidate.*

424 U.S. at 80, 96 S.Ct. at 664 (emphasis supplied). Had the Supreme Court meant to give the word "candidate" its technical definition, the use of adjectives such as "clearly identified" and "particular federal" would have been unnecessary. Additionally

fundamental cornerstones of American jurisprudence, has been ignored: "The intention of the legislature is to be collected from the words they employ. Where there is no ambiguity in the words, there is no room for construction."

throughout the opinion, "expenditure," "political committee," "contribution" and other similar terms used in the statute are put in quotation marks; the term "candidate" never appears in such a form. This is another indication that the everyday definition of "candidate" was intended by the Supreme Court.

The Supreme Court in *Buckley* sought to limit the intrusion of the federal government into areas protected by the first amendment. It was especially concerned that the Act might be construed "to reach groups engaged purely in issue discussion." *Id.* 424 U.S. at 80, 96 S.Ct. at 663. Congress sought to regulate federal elections "to insure both the reality and the appearance of the parity and openness of the federal election process." *Id.* 424 U.S. at 79, 96 S.Ct. at 663. The Supreme Court concluded:

> To fulfill the purposes of the Act they need only encompass organizations that are under the control of a candidate or *the major purpose of which is the nomination or election of a candidate.* Expenditures of candidates and of "political committees" so construed can be assumed to fall within the core area sought to be addressed by Congress. They are, by definition, campaign related.

424 U.S. at 80, 96 S.Ct. at 663 (emphasis added). Giving the everyday meaning to the term "candidate," it cannot be seriously disputed that the actions of the Florida for Kennedy Committee fall within the area which the Federal Election Commission has the power to regulate as modified by the Court. The purpose of the Act is quite simply not fulfilled if "draft committees" are allowed to slip through the cracks unregulated. Surely, the majority opinion opens the floodgates for contributions in unlimited amounts from sources never to be known to the public. By the use of such a technique, a person seeking election can have a sizable financial war chest (along with a host of unidentified political obligees) at the time he makes public his decision to become a candidate.

Thus, I believe that the majority's reliance upon *Buckley* is misplaced. In no way does *Buckley* mandate the result reached today.

It should also be noted that the Supreme Court in *Buckley* was not faced with the "draft committee" issue. Even if the majority does not accept my view as to the constitutionality of the Act as it relates to "draft committees," it still must address the issue as mandated by *Buckley*. In *Buckley*, as I have noted, the Supreme Court sought to place general parameters on the construction of the Act. In doing so, the Supreme Court stated that it was still giving force to the "core area" addressed by Congress, while trimming away some of the vague, fringe areas of the statute. The *Buckley* Court did not confront, as we are here, part of the core area of the statute being seriously in conflict (assuming *arguendo* the position of the majority) with the first amendment. I believe we must forthrightly confront this issue, even if the resolution of the point results in the quashing of the subpoena on constitutional grounds.

It is therefore our duty to reach the constitutional question presented. The majority asserts: "suffice to say that substantial constitutional questions would arise were we to adopt the FEC's position and hold that draft groups such as FKC were covered by the Act." I do not believe that serious constitutional questions are raised. I would hold that no associational rights are at issue in the instant case.

The Supreme Court has recognized that the compelled disclosure of certain associations may have a chilling effect upon activity protected by the first amendment. *E.g., Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Bates v. City of Little Rock*, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). These cases all involved governmental investigation into the NAACP, the goal of which was to obtain membership or contributor lists. Given the political climate of those times, the infor-

mation would probably have been used to "chill" membership in the organization.

However, the assertion by Florida for Kennedy of a danger to associational rights is not a magical incantation which carries the day for the appellants.[5] Rather, *NAACP v. Alabama, supra,* and subsequent cases interpreting it have indicated that there must be a threshold showing that there exists a "chilling effect" upon the organization as a result of the governmental inquiry. In that case, the Court noted:

> We think that the production order, in the respects here drawn in question, must be regarded as entailing the likelihood of a substantial restraint upon the exercise by petitioner's members of their right to freedom of association. Petitioner has made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility. Under these circumstances, we think it apparent that compelled disclosure of petitioner's Alabama membership is likely to affect adversely the ability of petitioner and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure.

357 U.S. at 462–63, 78 S.Ct. at 1172.[6] This sort of reasoning has been recently reaffirmed by the Supreme Court in *Buckley v. Valeo,* 424 U.S. at 69–71, 96 S.Ct. at 658–59.

The appellant has not raised even a colorable associational freedom claim. It was supporting the candidacy of an individual who narrowly lost the presidential nomination of one of the two major parties. No stigma could be attached to such efforts. Fear of a "chilling effect" upon such committees is simply so wild as to be baseless. The appellant has brought forth no facts or reasons which demonstrate how a "chilling effect" would come about. Thus, the threshold requirements of an associational rights claim have not been met in the instant case, as no reasonable likelihood that political association will be discouraged has been established.

However, assuming *arguendo* that the appellant has made a colorable associational rights claim, it is apparent that there is a compelling state interest against which these rights must be balanced.[7] The government, as recognized in *Buckley,* has a substantial interest in "informing the electorate and preventing the corruption of the political process."[8] Against this interest we have to balance the associational rights of those who were associated with the Florida for Kennedy Committee.

The potential for corruption in the instant situation, as discussed above, is great. Indeed, through "draft committees" it is possible to subvert the whole federal election regulatory process. There is no real threat to the associational rights of the supporters of the Florida for Kennedy Committee. They were supporters not of a fringe candidate, but rather they supported an individual who had widespread backing throughout the United States.[9] It is incon-

---

**5.** Cf. *Ambassador College v. Geotzke,* 675 F.2d 662, 665 (5th Cir. 1982) (church failed to establish that discovery against it would result in a "chilling effect" upon its membership).

**6.** Similar findings were made in such cases as *Shelton v. Tucker,* 364 U.S. 479, 486, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960); *Bates v. City of Little Rock,* 361 U.S. 516, 521–24, 80 S.Ct. 412, 415–17, 4 L.Ed.2d 480 (1960); and *Watkins v. United States,* 354 U.S. 178, 197–99, 77 S.Ct. 1173, 1184–85, 1 L.Ed.2d 1273 (1957).

**7.** In *NAACP v. Alabama, supra,* 357 U.S. at 460–61, 78 S.Ct. at 1163, the Supreme Court made clear that any state action infringing upon associational rights was subject to strict scrutiny.

**8.** 424 U.S. at 69, 96 S.Ct. at 659.

**9.** A different situation would be presented if supporters of a minor party candidate well outside the "mainstream" of American politics were involved. In such a case, there might well be a very real danger of a "chilling effect"

ceivable (and nowhere alleged) that any members of the committee had any fears with respect to intimidation or reprisals of the type which were the subject matter of the *NAACP v. Alabama* case and its progeny. The panel majority has been victimized into accepting an argument by appellant that is not only incredulous, but so ridiculous that the cheek of its protagonist must be permanently bent out of shape.[10]

Thus, since there are no associational rights at stake here, and the statute clearly embraces the activities of the committee, I dissent.

upon associational rights. Such groups, being generally quite unpopular, run certain risks that more conventional groups, like the Florida for Kennedy Committee, do not. Perhaps, the Second Circuit, in a recent decision, correctly decided that the Communist Party was not obliged to comply with the Federal Election Campaign Act's disclosure and recordkeeping requirements. *Federal Election Commission v. Hall-Tyner Campaign Committee*, 678 F.2d 416 (2d Cir. 1982). The Supreme Court in *Buckley* recognized that the Federal Election Campaign Act could, if applied to some groups which the vast majority of Americans view as odious, be an unconstitutional infringement upon associational rights. 424 U.S. at 71, 96 S.Ct. at 659. Of course, we are not faced with such a situation in the instant case.

10. One other item is deserving of mention. This court has the power to narrow the subpoena in question. Assuming *arguendo* that portions of the subpoena are unnecessarily broad for the purposes of the Federal Election Commission's investigation of the Florida for Kennedy Committee, certain items on the subpoena could be eliminated by this court, if such was its desire. I would be inclined to limit the first step in the discovery process. By doing so, any remote threat to associational rights could be avoided.